EMLE INDUSTRIES, INC., et al.,
Plaintiff,
and
GLEN RAVEN MILLS, INC., et al.,
Plaintiffs in Separate Actions
and Appellants,
v.
PATENTEX, INC., Defendant in All
Actions and Appellee,
and
Burlington Industries, Inc., Former
Defendant in Emle Action.
Nos. 668-673, Dockets 72-2048 to 72-2053.

United States Court of Appeals,
Second Circuit.

Argued April 3, 1973.

Decided May 9, 1973.

Frederic Houston, New York City, for appellant Glen Raven Mills, Inc.; John L. Ryan, New York City, for appellants Knit Products Corp., Bossong Hosiery Mills, Inc., Tower Hosiery Mills, Inc., and Holt Hosiery Mills Inc.; William T. Stephens, New York City, for appellant Alba-Waldensian, Inc. (Otterbourg, Steindler, Houston & Rosen, Pell & Le-Viness, Sullivan & Cromwell, New York City, Arthur O. Cooke, and Cooke & Cooke, Greensboro, N. C., on the brief).

George T. Mobille, Washington, D. C. (Robert S. Newman, Whitman & Ransom, New York City, George M. Sirilla, Cushman, Darby & Cushman, Washington, D. C., on the brief), for appellee.

Before KAUFMAN, ANDERSON and OAKES, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

We are called upon today to decide a question of acute sensitivity and importance, touching upon vital concerns of the legal profession and the public's interest in the scrupulous administration of justice. At issue is the disqualification of David Rabin, Esq., on the ground that his representation of the plaintiffs in the underlying actions below constituted a breach of Canon 4 of the Code of Professional Responsibility, which governs the conduct of lawyers.[1]

The complaints in these actions[2] sought declaratory judgments that patents held by Patentex, Inc., were invalid and unenforceable. The complaints alleged unlawful manipulation and control of Patentex by its part-owner, Burlington Industries, Inc., and charged Burlington with directing Patentex to improperly acquire and illegally use the patents in question to control prices in the yarn processing and knitting industry. Lead counsel for the plaintiffs, and self-acknowledged architect of all but one of the seven complaints in these actions, was David Rabin, a specialist in textile patent litigation. In the years between 1958 and 1962, however, Rabin had represented Burlington in another patent suit, referred to as the *Supp-hose* case,[3] which also called into question the nature and scope of Burlington's control over Patentex. Patentex, therefore, moved for Rabin's disqualification, asserting that Rabin's present adversarial posture might result in disclosure or conscious or unintentional use of confidential information acquired by him during the *Supp-hose* litigation. Judge Motley, in the district court, granted the motion, and this appeal followed.

We approach our task as a reviewing court in this case conscious of our responsibility to preserve a balance,

1. Canon 4 of the Code of Professional Responsibility provides that "A lawyer should preserve the confidences and secrets of a client."

2. Separate but similar complaints were filed by Emle Industries, Inc., Glen Raven Mills, Inc., Knit Products Corp., Bossong Hosiery Mills, Inc., Alba-Waldensian, Inc., Tower Hosiery Mills, Inc., and Holt Hosiery Mills, Inc. The actions were consolidated in the district court for pur-

poses of deciding the motion to disqualify and were similarly consolidated on appeal to this court. Emle Industries was adjudicated bankrupt on December 27, 1971, and has not participated in this appeal.

3. Triumph Hosiery Mills, Inc. v. Alamance Industries, Inc., 191 F.Supp. 652 (M.D. N.C.1961), aff'd, 299 F.2d 793 (4th Cir.), cert. denied 370 U.S. 924, 82 S.Ct. 1566, 8 L.Ed.2d 504 (1962).

delicate though it may be, between an individual's right to his own freely chosen counsel and the need to maintain the highest ethical standards of professional responsibility. This balance is essential if the public's trust in the integrity of the Bar is to be preserved. Moreover, we are mindful that ethical problems cannot be resolved in a vacuum. To affirm the order below will, to be sure, deprive plaintiffs of highly qualified counsel of their own choosing and may foreclose Rabin's participation in future actions brought against Burlington and Patentex. There can be no doubt, however, that we may not allow Rabin to press these claims against Patentex if, in doing so, he might employ information disclosed to him in confidence during his prior defense of Burlington. Such a result would work a serious injustice upon Burlington and Patentex and would tend to undermine public confidence in the Bar. Thus, even an appearance of impropriety requires prompt remedial action by the court. After thorough consideration, we conclude that Rabin's earlier defense of Burlington against charges that it controlled Patentex for illegal purposes precludes him from pressing similar claims in the instant suits. Accordingly, we affirm.

## I.

At the outset, it is useful to identify the central characters in this litigation. Burlington Industries Inc., whose executive offices are located in Greensboro, North Carolina, is, we are told, the world's largest textile company. As such, it is a major force in the yarn processing and knitting industry. Chadbourn Gotham, Inc., headquartered in Charlotte, North Carolina, is also a primary competitor in this field. These two companies each own fifty percent of the voting stock of Patentex, Inc. According to a Dun & Bradstreet report, Burlington and Chadbourn created Patentex in 1955 "to acquire title [from them] to patents and methods of manufacturing women's stretch stockings and processing yarns used in their manufac-ture . . . . [Patentex] license[d] other hosiery manufacturers under their patents and in turn receive[d] royalties for their use." Thus, in return for royalty payments, Burlington and Chadbourn allowed their competitors to employ knitting technology which they had patented.

Lawrence Greenwald was president of Patentex at the time of the *Supp-hose* litigation, discussed in greater detail below, but is no longer employed by either Patentex or Burlington. Edward Kobos became Assistant to the President and Secretary of Patentex in 1957 and continues to hold these posts today. In 1957, Douglas Orr was assistant general counsel of Burlington and served as chief counsel to Patentex. From 1964 until his retirement in 1971, he was Burlington's general counsel. Finally, David Rabin is a patent attorney who specializes in textile patents. In addition to both a bachelor's and a master's degree in law, his professional background includes a degree in mechanical engineering from Duke University and a period of employment in the United States Patent Office, where he specialized in yarn and knitting technology. His present office is in Greensboro, an area correctly categorized as "the heart of the textile industry."

Since an understanding of Rabin's prior involvement with Burlington in the *Supp-hose* case is essential to consideration of Patentex's motion to disqualify him from serving as counsel in the pending actions, we now turn to a discussion of these two proceedings.

## A. *The Prior Action: The* Supp-hose *Case*

The Rabin-Burlington-Patentex nexus was first formed in the *Supp-hose* case. The origins of that dispute date back to at least January, 1958, when Claussner Hosiery Co., a licensee of Patentex, inquired of Patentex President Greenwald whether it could manufacture hosiery with the same construction as a stretch support stocking then being marketed by Kayser-Roth, Inc. under the trade name

"Supp-hose." After several communications between Patentex and Claussner on this subject, Kobos, Greenwald's assistant, informed Claussner and certain other Patentex licensees that they could continue to manufacture stretch support stockings under several Patentex patents without infringing Kayser-Roth's patent. Patentex assured them that pursuant to its license agreement it would defend its licensees against any infringement actions brought against them by Kayser-Roth. Claussner's primary concern, however, was that Kayser-Roth would commence infringement actions throughout the country against Claussner's large retail customers, who in turn would threaten to withhold future retail orders unless Claussner defended them. When Claussner sought assurance from Patentex that the latter would defend such "third-party" actions as well, Kobos replied, on October 30, 1958, that "we would not be willing to undertake to defend you in the event one of your retail customers were sued, even though you were later voluntarily or involuntarily involved in the suit."

At this juncture, Claussner turned to Rabin for professional advice. Rabin suggested that the wisest course for Claussner to follow would be to initiate litigation in a forum of its own choosing seeking a declaratory judgment that Kayser-Roth's patent was invalid. At Claussner's request, Rabin prepared an appropriate complaint for Claussner and its affiliate, McCallum Hosiery Co. Claussner subsequently consented to joining two other Rabin clients, Triumph Hosiery Mills and Hudson Hosiery Co., as plaintiffs in the action.

After his retention by these four hosiery mills, Rabin met with Orr, at that time Burlington's assistant general counsel, to discuss Patentex's attitude toward the impending litigation. Although Orr again rebuffed a request to defend any actions that Kayser-Roth might bring against retail customers of Patentex's licensees, he indicated that Burlington would be interested in joining the contemplated declaratory judg-ment action against Kayser-Roth and, accordingly, requested Rabin to represent Burlington as well. According to Rabin, he responded by "explain[ing] to Mr. Orr that [he] was flattered with the invitation [to represent Burlington] but in view of the then pending actions against Burlington and [his] position of representing Claussner, McCallum, and Hudson, [he] would have to decline." The currently pending actions to which Rabin referred were two infringement actions—both unrelated to the Kayser-Roth matter—which Rabin was prosecuting against Burlington on behalf of Floyd Shoaf, an inventor, and Tight Pat, Inc., owner of an allegedly infringed patent. The conflict concerning Claussner, McCallum, and Hudson to which Rabin alluded was, of course, their potential claims against Patentex based on the indemnity clause in the license agreement. After discussing these matters with Orr, Rabin conferred with Shoaf and representatives of Claussner, McCallum, Hudson, and Tight Pat. Rabin then informed Orr that his clients had consented to his representation of Burlington and that Rabin would do so as long as he maintained "the right to protect and preserve any claims of my various clients with respect to Patentex, Inc."

Following this agreement, in December, 1958, Rabin filed a complaint against Kayser-Roth and its subsidiary, Alamance Industries, seeking a declaratory judgment that the Supp-hose patent was invalid. In February, 1959, Kayser-Roth served its answer, denying that its patent was invalid. In addition, Kayser-Roth asserted a counterclaim, alleging that

The Plaintiff, Burlington Industries, Inc., through its officers and agents, and through Patentex, Inc. . . . a company which the Plaintiff, Burlington Industries, Inc., actively controls, has individually and in Plaintiffs, actively induced infringement of the aforesaid patent-in-suit concert and cooperation with the other . . . by said Plaintiffs and others

[the Patentex licensees] . . . for the purpose of unlawfully exploiting and destroying Defendants' property rights in said invention and destroying or adversely affecting Defendants' United States and foreign business in said invention.

Thus, for the first time, Burlington's alleged control of Patentex had become an issue in the Supp-hose case. Accordingly, Kayser-Roth took pre-trial depositions of Greenwald, Kobos, and Orr for the purpose of exploring the nature and degree of that control. The thrust of this inquiry is illustrated by the following testimony by Patentex President Greenwald:

Q. How does Patentex communicate with Burlington?

A. Usually by word of mouth, I guess.

Q. Do you have any written memos or inter-office communications?

A. I am not much of a writer. People are in the next office—I usually talk to them. I don't write them notes. I won't say I never have, but I don't make a general practice of it.

Q. Do you have any records of communications between Patentex and Burlington relative to the subject matter of this litigation?

A. Not that I know of.

\* \* \* \* \* \*

Q. How often does the board of directors of Patentex meet?

A. It's required by its by-laws to meet once a year and it meets possibly once or twice a year in between.

Q. In connection with the day-to-day operations of Patentex, who is in charge of that?

A. I am.

Q. With respect to the policy and decisions and judgments that are taken day-to-day, is that your responsibility?

A. Within limits. If they are policy matters, then I consult the directors.

\* \* \* \* \* \*

Q. Burlington is charged with the duty of managing Patentex, is it not?

A. I believe I elaborated on that once before. That is true but it's a trust. When I say "it's a trust", I mean I am entrusted with the management of it and the decisions and policy are arrived at jointly with Chadbourn-Gotham and Burlington and that I have never taken anything upon myself that I thought could be questioned.

While it is unclear whether Rabin participated in preparatory conferences with anyone other than Greenwald, it is undisputed that Rabin was present as counsel for Burlington at each deposition at which Burlington's relationship with Patentex was discussed.

Other events raised the issue of Burlington's control of Patentex in yet another way. Upon receipt of the counterclaim, Rabin sent notice to Patentex, on behalf of his clients, indicating that its licensees had been charged with infringement. In response to Rabin's letter, Greenwald, in correspondence dated August 18, 1959, called to Rabin's attention paragraph eleven of the license agreement, which provides that "If, after notification to Licensor by Licensee of . . . the institution of suit for alleged infringement, Licensor, upon advice of its counsel, shall inform Licensee that the claim of infringement appears to be valid, Licensor may advise Licensee to modify its methods or processes of manufacture to avoid such infringement. . . ." Accordingly, Greenwald suggested that the licensees should alter their methods of manufacture "so as to avoid any infringement of [Kayser-Roth's patent]." Kayser-Roth discovered this letter during a deposition and sought at trial to characterize its contents as an admission by Patentex of the validity of Kayser-Roth's Supp-hose patent. Kayser-Roth argued, albeit unsuccessfully, that the admission could be imputed to Burlington because of its control of Patentex.

Thus, although the *Supp-hose* litigation ultimately concluded in 1962 with a declaration that Kayser-Roth's patent was invalid, the nature and extent of Burlington's control over Patentex was, beyond peradventure, a disputed matter in that case. That question was in sharp focus both because of Kayser-Roth's direct charge that Burlington caused Patentex to induce its licensees to infringe the Supp-hose patent, and because of Kayser-Roth's attempt to impute to Burlington the alleged admission of validity in Greenwald's August 18, 1959 letter.

With this background in mind, the question remains whether a substantially related issue is present in the instant actions, such as to require the disqualification of Mr. Rabin. To that question we now turn.

B. *The Present Actions*

Our discussion of the instant controversy is, perforce, a limited one, since other than the submission of affidavits and depositions pertaining to the motion for disqualification, and the filing of the parties' complaints and answers, there has been little activity directed towards resolving the merits of the underlying dispute. Emle and three affiliated companies, represented by Rabin, filed their complaint in May 1968, naming as defendants both Patentex and Burlington. Of particular interest is paragraph 12 of the complaint, prepared entirely by Mr. Rabin, which alleges that

> *Defendant Patentex, Inc. is a patent holding and licensing company controlled by defendant Burlington Industries, Inc.* and holds numerous patents pooled together from various sources for the purpose of controlling the manufacture and sale of stretchable knitted fabrics, including hosiery, the method of manufacture thereof, and the processing of yarns to impart torque characteristics, among other products. *Defendant Burlington Industries, Inc., through management of Patentex, Inc.,* has acquired competing patents through the resolution of interference proceedings in the United States Patent Office, and otherwise, and has endeavored to license the entire yarn processing industry and knitting industry, of which Burlington Industries, Inc. is a major entity, through preferential and discriminatory agreements, with the resolution of such proceedings occurring without regard to the first and true inventor of the alleged inventions, and have misused such patents. [emphasis supplied]

The complaint sought "an adjudication that defendants have misused their patents . . . and that such patents are unenforceable." Patentex's answer, apart from admitting that it was a company holding title to patents acquired from various sources, denied all other allegations in paragraph 12. As indicated by that portion of paragraph 12 that we have underscored for emphasis, the issue of Burlington's control of Patentex was contested in the present action just as it was in the *Supp-hose* case.

Five additional complaints—those of Knit Products, Bossong Hosiery Mills, Alba-Waldensian, Tower Hosiery Mills, and Holt Hosiery Mills—which also are part of this consolidated action, though drafted by Rabin as well, were not filed until May, 1970. These suits by Patentex licensees, which did not name Burlington as a defendant, grew out of a demand made by Patentex that they sign a new license agreement more favorable to Patentex. According to Rabin,

> I had been consulted by the various clients whom I had represented over a substantial number of years, conferred with them and the decision was made, in view of substantial unauthorized infringements by others, among other reasons, that these actions would be brought after the license agreements were repudiated, and it was not found necessary to bring Burlington into that lawsuit because there had been no threats made by Burlington, just solely against Patentex because Patentex was the licensor.

These complaints, however, differed from the Emle complaint only in the amount of specifics provided for the claim of misuse. After alleging that "Patentex is a patent holding and licensing company . . . owned by Burlington Industries, Inc. and Chadbourn, Inc. and . . . organized for the purpose, among others, of acquiring competing patents and patent applications in the yarn processing and knitting industry," the complaints detailed eleven ways in which Patentex's licensing program constitutes a misuse of its patents.[4] In addition, the complaints specifically claimed that the licensing program violates the antitrust laws. The seventh complaint, filed by Glen Raven Mills in February, 1970, was not prepared by Rabin but Glen Raven's attorney, Frederic Houston, conceded that he referred to Rabin's Emle complaint while drafting it. Rabin undertook to represent Glen Raven in June, 1971.

Aside from a few requests for admissions and interrogatories served by Pat-entex and Burlington in the Emle action, these matters lay dormant until May, 1971. On May 25 of that year, however, Burlington moved to dismiss the Emle complaint under Rule 12(b)(6), F.R.Civ.P., for failure to allege the existence of an actual controversy between the Emle plaintiffs and Burlington. In order to prepare a defense to this motion, Rabin sought to depose Kobos, still Assistant to the President of Patentex and its Secretary. Rabin had only begun questioning Kobos on his duties at Patentex when counsel for Patentex instructed Kobos not to respond to any further questions. Subsequently, on September 27, 1971, Patentex filed a motion to disqualify Rabin from representing the plaintiff in each action on the ground that Rabin's involvement constituted a breach of professional ethics. As we have noted, the actions were consolidated for the purposes of deciding this motion and came before Judge Motley. She concluded that "the issues of the control of Patentex by Burlington

---

4. Upon information and belief, the activities and conduct of Patentex in its patent licensing programs in the yarn throwing industry and the knitting industry constitute a misuse of the Patentex patents among other reasons:

 (a) conducting a package licensing program of numerous patents and obligating licensees to pay royalties irrespective of the use of said entire package and without setting a royalty for unrelated patents in the package;

 (b) illegally tying a group of competing patents in a single package;

 (c) granting preferential licenses at discriminatory royalty rates under the same patent;

 (d) unlawfully demanding and collecting royalties on unpatented devices and products beyond the expiration date of one or more of the license patents without reducing or modifying the royalty rate;

 (e) requiring licensees to grant back to Patentex improvements made in yarn throwing and knitting resulting in restraining improvements and developments in yarn throwing and knitting and perpetuating a patent pool of indeterminate duration and beyond the terms of the licensed patents;

 (f) discriminatorily waiving or knowingly refusing to collect royalties uniformly from (1) yarn throwsters and (2) knitters;

 (g) extracting as a condition for becoming a patent licensee under the Patentex patents that the validity of the Patentex patents would not be contested at any time by the licensee irrespective of termination of the license agreement or a determination of invalidity of one or more Patentex patents by a court of competent jurisdiction;

 (h) entering into discriminatory licensing arrangements in its licensing programs by nonuniform licensing provisions among different licensees including but not limited to exempting some licensees from payment of royalties while demanding that other licensees pay royalties upon goods of the same quality, description and characteristics;

 (i) refusing to honor its expressed commitment and obligation to most favorable royalty treatment of licensees and not to others;

 (j) acquiring patents through misrepresentations and fraud upon the United States Patent Office; and

 (k) illegally cross-licensing and pooling of patents.

and the business relationships between Patentex and Burlington were present in the *Supp-Hose* Case and are also present in the instant cases" and accordingly granted the motions to disqualify Rabin. This appeal followed.[5]

## II.

As previously indicated, Canon 4 of the Code of Professional Responsibility provides that "A lawyer should preserve the confidences and secrets of a client." We take as our guidepost in applying the language of Canon 4 to this case the standard articulated by Judge Weinfeld in T.C. Theatre Corp. v. Warner Bros. Pictures, 113 F.Supp. 265 (S.D.N.Y. 1953). There, the court said:

> I hold that the former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are *substantially related* to the matters or cause of action wherein the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained.[6]

113 F.Supp. at 268–269 (emphasis supplied). The "substantially related" test has been approved and followed by subsequent decisions, *see, e.g.*, Consolidated Theatres v. Warner Bros., 216 F.2d 920 (2d Cir. 1954); Doe v. A. Corp., 330 F. Supp. 1352 (S.D.N.Y.1971), aff'd, 453 F.2d 1375 (2d Cir. 1972) (per curiam); Empire Linotype School v. United States 143 F.Supp. 627 (S.D.N.Y.1956); United States v. Standard Oil Company, 136 F.Supp. 345 (S.D.N.Y.1955), and has been embraced by both sides in this proceeding.[7]

Canon 4 implicitly incorporates the admonition, embodied in old Canon 6, that "The [lawyer's] obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed." Without strict enforcement of such high ethical standards, a client would hardly be inclined to discuss his problems freely and in depth with his lawyer, for he would justifiably fear that information he reveals to his lawyer

---

5. We have jurisdiction to review an order disqualifying an attorney under the doctrine of Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *See* Fleischer v. Phillips, 264 F.2d 515 (2d Cir.), cert. denied, 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959); Marco v. Dulles, 268 F.2d 192 (2d Cir. 1969); 9 Moore, Federal Practice ¶ 110.13 [10].

6. At the time of Judge Weinfeld's decision, preservation of a client's confidences was governed by Canons 6 and 37 of the Canons of Professional Ethics, whereas the motion to disqualify in the instant case was made under Canon 4 of the Code of Professional Responsibility, which superseded the Canons on January 1, 1970. The difference is immaterial, however, since "Canon 4 and its subjoined rules make no changes in settled principles of ethics involving the preservation of confidential cliental information. These precepts have been traditional in the relationship of client and lawyer in the art of legal ethics, preserved by old Canons 6, 11, and 37 . . . . ." R. Wise, Legal Ethics 65 (1970).

7. There can be no doubt that Judge Motley applied this standard. She specifically stated that

> Applying the test enunciated by Judge Weinfeld of this Court in T.C. Theatre Corp. v. Warner Bros. Pictures, 113 F. Supp. 265 (1953), the court finds and concludes the motion to disqualify Mr. Rabin on the ground of conflict of interest must be granted.

> . . . . .

> [T]he issues of the control of Patentex by Burlington and the business relationships between Patentex and Burlington were present in the *Supp-Hose* case and are also present in the instant cases.

on one day may be used against him on the next. A lawyer's good faith, although essential in all his professional activity, is, nevertheless, an inadequate safeguard when standing alone. Even the most rigorous self-discipline might not prevent a lawyer from unconsciously using or manipulating a confidence acquired in the earlier representation and transforming it into a telling advantage in the subsequent litigation. Or, out of an excess of good faith, a lawyer might bend too far in the opposite direction, refraining from seizing a legitimate opportunity for fear that such a tactic might give rise to an appearance of impropriety. In neither event would the litigant's or the public's interest be well served. The dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case. These considerations require application of a strict prophylactic rule to prevent any possibility, however slight, that confidential information acquired from a client during a previous relationship may subsequently be used to the client's disadvantage.

■ Moreover, the court need not, indeed cannot, inquire whether the lawyer did, *in fact*, receive confidential information during his previous employment which might be used to the client's disadvantage. Such an inquiry would prove destructive of the weighty policy considerations that serve as the pillars of Canon 4 of the Code, for the client's ultimate and compelled response to an attorney's claim of non-access would necessarily be to describe in detail the confidential information previously disclosed and now sought to be preserved. Thus, where "it can reasonably be said that in the course of the former representation the attorney *might* have acquired information related to the subject matter of his subsequent representation," T.C. Theatre Corp., *supra*, at 269, (emphasis supplied), it is the court's duty to order the attorney disqualified. Nowhere is Shakespeare's observation that "there is nothing either good or bad but thinking makes it so," more apt than in the realm of ethical considerations. It is for this reason that Canon 9 of the Code of Professional Responsibility cautions that "A lawyer should avoid even the appearance of professional impropriety" and it has been said that a "lawyer should avoid representation of a party in a suit against a former client, where there may be the appearance of a possible violation of confidence, even though this may not be true in fact." American Bar Association, Standing Committee on Professional Ethics, Informal Opinion No. 885 (Nov. 2, 1965).

■ Examination of the issues in the *Supp-hose* case and in the present actions, in light of the "substantial relationship" test, leads inexorably to the conclusion that Rabin properly was disqualified from representing the plaintiffs in the present actions. Each proceeding involves a claim that Burlington controls Patentex and uses this control for an illegal purpose. In the *Supp-hose* case, Kayser-Roth argued that Burlington's control was used to destroy the *Supp-hose* patent and, also, that this control justified imputing to Burlington an admission made by Patentex. In the present suits, plaintiffs alleged that such control permitted Burlington, through Patentex, to fix prices within an industry in which Burlington is the dominant factor.

Rabin himself recognized the identity of issues between the two cases in his deposition on the motion to disqualify:

Q. My question, however, was very simply this: Did the defendants in the *Supp-hose* case go into the relationship of Burlington and Patentex, during the depositions of Kobos, Orr, Greenwald . . . at which depositions you were in attendance, being Burlington's counsel?

A. [Mr. Rabin]: That is correct.

Q. They did?

A. Yes. They went into the relationship between, to the best of my knowledge, of who owned or controlled Patentex.

Q. Right. Whether Burlington owns and/or controls Patentex.

A. That's right.

\* \* \* \* \* \*

Q. And I believe it is correct, is it not, that Burlington Industries was named as a codefendant in the Complaint you prepared and filed in the behalf of Emle?

A. That is correct.

\* \* \* \* \* \*

Q. You agree, do you not, that one of the issues raised by paragraph twelve [of the Emle complaint] is the extent, if any, of Burlington's control over Patentex?

A. I think I indicated to you before, Mr. Mobile, this was the position that I had, that I—yes.

Q. The answer is yes?

A. Yes, the answer is yes.

\* \* \* \* \* \*

Q. Well, it is a fact, is it not, that, in every one of the 1970 actions . . the issue of Burlington's control over Patentex was raised in the Complaints you filed as it was in the Complaint in the Emle case?

A. Yes.

Q. That is a fact, isn't it?

A. Right.

Rabin's testimony underscores the inference of substantial relationship of issues, easily drawn from an examination of the pleadings alone in each proceeding. It is clear, therefore, that there are matters in controversy in each case —both the nature and scope of control, if any, exercised by Burlington over Patentex—that are not merely "substantially related," but are in fact identical.

■ It is strenuously argued, however, that control of Patentex by Burlington was conceded in a stipulation by Burlington in the *Supp-hose* case and, therefore, is not at issue here. Plaintiffs contend, instead, that the disputed matter in each case is the use to which Burlington put its control over Patentex and that this use differs in each action. The simple answer to this argument, however subtly advanced, is that it is factually incorrect. The stipulation in the *Supp-hose* case merely recited that "Burlington and Chadbourn each own 50% of the voting stock of Patentex, and Burlington owns 45% and Chadbourn owns 55% of the non-voting stock, and the majority of the Patentex Board of Directors are Burlington men and the minority are Chadbourn men." It stated further that "Burlington pays the salaries of Patentex employees and certain other expenses of Patentex, and the amount attributable to Patentex is charged back against Patentex's account." We are unable to agree that a concession that Burlington owned fifty percent—less than a majority—of Patentex's voting shares is tantamount to an admission by Burlington that it exercised day-to-day or week-to-week control over Patentex and that it caused Patentex to engage in illegal activity. Moreover, Greenwald's deposition in the *Supp-hose* case, with its emphasis on his relationship with Burlington executives and its concern with Greenwald's degree of decision-making freedom, demonstrates that the question of control was an important issue in that case, one not resolved by stipulation. Thus, although in both the prior and the present case the parties sought to prove that Burlington had achieved an illegal end through Patentex, in each case they first faced the burden of proving that Burlington did, in fact, control Patentex in such a manner that the alleged illegal ends could be achieved.

■ It is urged that the fact of Burlington's control of Patentex was widely known throughout the industry and that such notoriety removes that issue from the case. We do not understand what this "notoriety" argument proves. Henry Drinker, a leading authority in the field of legal ethics, notes that the client's privilege in confidential information disclosed to his attorney "is not

nullified by the fact that the circumstances to be disclosed are part of a public record, or that there are other available sources for such information, or by the fact that the lawyer received the same information from other sources." H. Drinker, Legal Ethics 135 (1953).[8] Here, even assuming *arguendo* that Burlington's control of Patentex was "notorious" within the industry, it can hardly be contended that "trade gossip" is sufficiently reliable such as to constitute the basis of formal proof. The issue of control—its nature and scope—remained to be developed at trial, and Rabin, were he permitted to represent the plaintiffs in any further proceedings, might make use of confidential information establishing Burlington's alleged control over Patentex. Thus, industry "notoriety" of Burlington's control does not bear even one iota upon the ethical considerations here involved.

■ Two final questions remain. The plaintiffs contend that at the time Rabin undertook to represent Burlington in the *Supp-hose* case, it was agreed that Burlington would not move to disqualify Rabin in *any* future matter in which he opposed Burlington. This claim, however, fails to withstand scrutiny. An examination of Rabin's own recollection of the agreement leads to a conclusion that the Burlington-Rabin agreement dealt only with Rabin's ability to continue prosecution of the unrelated Shoaf and Tight Pat actions, referred to earlier, and his freedom to press, if necessary, the potential indemnity claims of Claussner, McCallum, and Hudson under the Patentex license agreement. According to Rabin, he "was flattered with the invitation [to represent Burlington] but *in view of the then pending*

actions against Burlington and [*his*] *position representing Claussner, McCallum, and Hudson,* [he] would have to decline." (emphasis supplied) It was only in response to these specific concerns that Orr stated, again according to Rabin, "that no conflict would arise in the future." This limited view of the agreement also is supported by Orr's recollection of the understanding:

Q. Well, to refresh your recollection, do you recall Mr. Rabin indicating to you that he had a conflict with existing litigation?

A. [Mr. Orr]: With respect to the Claussner case, I remember he did.

Q. The *Supp-Hose* case?

A. The Claussner claim for indemnity, yes.

Q. And that if he undertook to represent Burlington that he would be in a position of conflict or could be in a position of conflict by reason of his representation of Shoaf and Tight Pat?

A. No.

Q. What was the conflict?

A. Well, the possible conflict that he would want to reserve any rights that Claussner and his other clients who were licensees of Patentex might have to bring suit against Patentex on the indemnity agreement.

Q. Did he make it clear to you that he reserved these rights if he should represent Burlington?

A. Yes.

It would be unreasonable to read Orr's recognition and acceptance of these potential conflicts as a blanket waiver by Burlington covering all possible future claims in which Rabin might be involved

---

8. This reasoning also explains why Rabin is barred from these actions despite his claim that he became aware of Burlington's control of Patentex during a previous defense of Bossong Hosiery Mills in a patent infringement action brought against it by Patentex. Rabin asserts that he became familiar with Burlington's relationship with Patentex in order to prosecute Bossong's counterclaim that

Patentex misused its patents "in the exercise of a concerted effort to monopolize illegally the field of stretch yarn production . . . ." This representation cannot destroy the inference that during his subsequent attorney-client relationship with Burlington, Rabin became privy to confidential information not disclosed during the Bossong action.

in a posture adverse to Burlington. Rabin himself conceded that he "was not that clairvoyant to ask something of that sort." In light of the strict prophylactic purposes of Canon 4's injunction to preserve a client's confidences, we do not find an all-inclusive waiver in this case.

 Lastly, it is urged that Burlington's motion to disqualify Rabin is barred by the doctrine of laches. This claim too must fail. Since, as we have noted, disqualification is in the public interest, the court cannot act contrary to that interest by permitting a party's delay in moving for disqualification to justify the continuance of a breach of the Code of Professional Responsibility. *See* United States v. Standard Oil Co., *supra*, 136 F.Supp. at 351 n. 6. Accordingly, "the Court's duty and power to regulate the conduct of attorneys practicing before it, in accordance with the Canons, cannot be defeated by the laches of a private party or complainant." *Empire Linotype School, supra*, 143 F.Supp. at 631. Although in an extreme case a party's delay in making a motion for disqualification may be given some weight, *see* Marco v. Dulles, 169 F.Supp. 622, 632 (S.D.N.Y.1959) (nineteen year delay), such extenuating circumstances are not present here. The three-year gap between filing of the Emle action in 1968 and Patentex's motion to disqualify Rabin in 1971 is not extraordinary. Moreover, plaintiffs themselves allowed the actions to remain virtually dormant and they have not demonstrated that Patentex's delay has caused them any prejudice. Indeed, whatever delay may have accompanied Patentex's motion to disqualify Mr. Rabin has, if anything, worked to its disadvantage and not to that of the plaintiffs. Appellants themselves suggest that the delay has rendered Patentex's claim of prejudice under Canon 4 moot because Mr. Rabin has been associated with this matter for over five years. If that is true, it can hardly be argued that appellants would have been better situated if Patentex had moved for disqualification at an earlier time, for had they done so appellants would have been deprived of Rabin's services altogether. Laches is an equitable remedy and the court will not bar a claim on that ground where no prejudice has resulted from the delay.

### IV.

 In light of all we have said, we conclude that the issue of Burlington's control over Patentex was a disputed matter in the *Supp-hose* case and is a core subject of the controversy in the present actions. Since Rabin defended Burlington against such a claim in the *Supp-hose* case he must be barred from asserting a "substantially related" claim against Burlington on behalf of the present plaintiffs. For the reasons set forth above, we need not inquire whether Rabin in fact had access to confidential information when he represented Burlington in the *Supp-hose* case.[9] We realize, of course, that Rabin's disqualification may inconvenience plaintiffs, who undoubtedly chose Rabin in the belief that he was the best attorney to prosecute their claims. Moreover, without impugning its motives, we are not so naive as to believe that Patentex will be displeased to see Rabin, effective advocate that he is, removed from these proceedings. But the possibility that Patentex may benefit from Rabin's disqualification cannot alter our conclusion that his continued participation in these proceedings would constitute a serious breach of professional ethics. Further-

9. In connection with their claim of non-access, plaintiffs argue that the district court should have held an evidentiary hearing on this point. In addition to the compelling policy reasons against such a procedure, we note that Judge Motley considered extensive affidavits and depositions submitted by the parties and reviewed them at length during an oral hearing on the motion. Such procedures have proven adequate in other cases presenting complicated facts. *See, e. g.*, United States v. Standard Oil Co. (N.J.), 136 F.Supp. 345 (S.D.N.Y.1955). Moreover, no request for an evidentiary hearing was made in the district court.

more, we are certain that despite his considerable talents, Rabin is not the only member of the patent bar qualified to capably represent these plaintiffs.

■ It is argued that to disqualify Rabin from these actions in an excess of ethical zeal will permit the defendant to monopolize patent counsel. We can only note, however, that it is hardly appropriate to cast aside ethical responsibilities out of an excess of antimonopolistic fervor. Reduced to basics, this argument would permit Rabin to represent plaintiffs only by carving out a special exception to the strictures of Canon 4 for situations in which a motion for disqualification has been made by a large corporate litigant against an attorney who has crossed sides to represent smaller interests. Nothing in the Code of Professional Responsibility or in the teaching of prior cases warrants such ethical relativity, for the Code, like its predecessor the Canons of Professional Ethics, "set[s] up a high moral standard, akin to that applicable to a fiduciary. . . . Without firm judicial support, the Canons of Ethics would be only reverberating generalities." Empire Linotype School v. United States, 143 F.Supp. 627, 633 (S.D.N.Y.1956). We have said that our duty in this case is owed not only to the parties—who by chance consist of a group of smaller competitors arrayed against the industry giant—but to the public as well. These interests require this court to exercise its leadership to insure that nothing, not even the appearance of impropriety, is permitted to tarnish our judicial process. The stature of the profession and the courts, and the esteem in which they are held, are dependent upon the complete absence of even a semblance of improper conduct. We conclude, therefore, that the substantial relationship between matters contested in the *Supp-hose* litigation and issues raised in the present actions requires that Rabin be barred from further participation in these proceedings.

Accordingly, the order of the district court is affirmed.