Mark C. SMITH, III, Plaintiff,

v.

NEW ORLEANS FEDERAL SAVINGS
AND LOAN ASSOCIATION et
al., Defendants.

Civ. A. Nos. 78–4008, 79–125.

United States District Court,
E. D. Louisiana.

July 11, 1979.

Henry L. Klein, New Orleans, La., for plaintiff.

Michael S. Fawer, Matthew H. Greenbaum, New Orleans, La., for defendants.

CASSIBRY, District Judge:

## I. INTRODUCTION

Plaintiff Mark Smith is the former Chairman of the Board of Directors of the New Orleans Federal Savings and Loan Association (NOF or the homestead). In October, 1978, he was removed as Chairman of the Board of NOF and in November, 1978, he was removed from the Board entirely. He has brought two actions before this Court. In one, Smith challenges his removal from the Board of NOF. In the other, Smith, on behalf of a class consisting of all members of NOF, seeks the removal of the current Directors. In each case, the current Directors and the homestead are named as defendants.

The defendants claim that prior to his ouster Smith had committed numerous improprieties, some of them drawing the critical attention of the Federal Home Loan Bank Board (FHLBB). They contend that Smith was removed from the Board for legal and sufficient cause. Smith charges that his removal was wrongful. He claims that he was removed in retaliation for his having uncovered massive improper securities transactions on the part of certain homestead personnel. He seeks the removal of the current Board because of his wrongful ouster, the securities transactions, and certain other alleged illegal acts.

Smith is represented by Henry Klein, of the firm of Klein and Rouse. Klein has been Smith's attorney for the past eight years. While Smith was associated with NOF, however, Klein served as the homestead's attorney on various matters. Further, Klein's current partner, Gary Rouse, was formerly associated with the firm of Kavanaugh and Talley, which is NOF's regular counsel and receives a retainer from the homestead. While at that firm, Rouse represented NOF on several occasions. These legal associations of Messrs. Klein and Rouse with the homestead constitute one ground for defendants' motion to disqualify their firm as plaintiff's counsel. Defendants claim that they cannot be sued here by attorneys who have represented them in the past.

The other ground for the motion is based upon the ethical proscription against an attorney being a witness in a case that he tries. The defendants claim that both Klein and Rouse have been exposed to occurrences and events about which they will likely be called to testify at trial, thus requiring disqualification of their law firm.

## II. THE INSTANT LITIGATION

### A. The facts

In March, 1976, the Federal Home Loan Bank Board issued a Cease and Desist Order against NOF, to which the homestead consented. The Order was based upon a series of legal violations with which the

FHLBB charged the homestead. A substantial portion of the incidents set out in the FHLBB's Notice of Charges involved Mark Smith, who was then Chairman of the Board of NOF. The FHLBB charged Smith with conflicts of interest in several areas of the homestead's business. For example, the FHLBB charged that a wholly-owned subsidiary of NOF had purchased real property from a corporation in which Mark Smith and a member of his immediate family had financial interests, and it cited NOF's financial dealings with a company named Tall Pines, Inc. as an instance of this kind of conflict of interest. The homestead remained under close FHLBB scrutiny after the entry of the Order.

From about August, 1977, through May, 1978, various persons at the homestead engaged in large-scale securities transactions. David Gatto, the President of NOF, was involved in some of these transactions. Gatto claims that his participation was an appropriate attempt to extricate the homestead from a dangerous situation. Mark Smith charges that Gatto's involvement was improper and illegal, and that he (Smith) was in the process of uncovering the wrongdoing of Gatto and others when he was ousted.

Mark Smith was removed from his position as Chairman of the Board of NOF on October 19, 1978. On the same day, a committee of Directors was appointed by the Board to investigate the recent securities transactions. That Committee consisted of Mark Smith and Conrad Franz. On October 24, Smith served a set of interrogatories concerning the securities transactions on each Board member, and on October 26, a second set of interrogatories was served on these same persons.

On November 22, 1978, the Board of Directors of NOF passed a Resolution removing Mark Smith as a Director "for cause." Eight examples of Smith's "unsuitable" conduct were set out. One such ground was the conduct by Smith that led to the FHLBB's Cease and Desist Order of March, 1976. Another was the Board's charge that Smith had misapplied to his own benefit

services or other things of value that belonged to the homestead.

In December, 1978, First Bank of Slidell, Louisiana, seized Mark Smith's accounts at NOF in satisfaction of a judgment it had against him. Smith has apparently been unable to open new savings accounts at NOF.

B. The issues

In the instant lawsuits, Mark Smith has brought into question the grounds for his removal from the Board of Directors of NOF. The defendants contend that the causes set out in the November 22 Resolution have a basis in fact and are sufficient to support Smith's removal. Smith claims to the contrary. Accordingly, the alleged improprieties on the part of Mark Smith will be disputed issues before the court.

A related issue will concern the motivation of the Directors in removing Smith. Smith has explicitly alleged that his removal was motivated by a bad-faith desire to thwart his uncovering the securities transaction. Defendants, of course, contend that they acted with the interests of NOF in mind.

The securities transactions themselves present another important matter in dispute here. Smith contends not only that they underlie his removal, but also that they should constitute a ground for the removal of certain Directors.

Finally, the court will be asked to consider whether any Directors participated in other improper actions directed toward Mark Smith. Specifically, Smith has claimed that certain Directors caused his savings accounts at NOF to be closed and to remain closed, in an effort to prevent Smith from being qualified to be a Director of the homestead.

III. THE FORMER REPRESENTATION OF THE HOMESTEAD BY MESSRS. KLEIN AND ROUSE

A. The legal standards to be applied

Under Canons 4 and 9 of the Code of Professional Responsibility, the possible conflict of interest presented by an attor-

ney representing interests adverse to those of a former client is resolved, in this Circuit, under the following basic rule:

. . . a former client seeking to disqualify an attorney who appears on behalf of his adversary, need only to show that the matters embraced within the pending suit are *substantially related* to the matters or cause of action wherein the attorney previously represented him.

*Wilson P. Abraham Const. Co. v. Armco Steel Corp.*, 559 F.2d 250, 252 (5th Cir. 1977) (emphasis in original). *Accord In Re Yarn Processing Patent Validity Litigation*, 530 F.2d 83 (5th Cir. 1976); *Brennan's, Inc. v. Brennan's Restaurants, Inc.*, 5th Cir. 1979, 590 F.2d 168; *United States v. Kitchin*, 5th Cir. 1979, 592 F.2d 900.

In *Abraham*, the Fifth Circuit elaborated that:

This rule rests upon the presumption that confidences potentially damaging to the client have been disclosed to the attorney during the former period of representation. The Court may not even inquire as to whether such disclosures were in fact made or whether the attorney in fact is likely to use the damaging disclosures to the detriment of his former client.

559 F.2d at 252. However, the *Abraham* panel remanded the case to the district court for factual findings as to the "content of the information which was exchanged." 559 F.2d at 253. Klein argues that I should follow this action of the Fifth Circuit and make similar findings. I disagree. The *Abraham* case presented a unique factual situation in which it was not a former client seeking disqualification, but rather co-defendants of a former client. The court pointed out that under those circumstances, there was no presumption that confidential information was exchanged. 559 F.2d at 253. Where, as in the instant case, there has formerly been a direct attorney-client relationship between the attorney and the person seeking his disqualification, such a presumption does exist. *Abraham, supra*, 559 F.2d at 253; *Brennan's, supra*, at 173; *Kitchin, supra*, at 904.

These strict rules rest on sound policy. A client must be able frankly and freely to provide information to his attorney without fear that the information might later be used against him. Were an attorney allowed to misuse such information, the client would feel justifiably wronged and public confidence in the legal system would be undermined. *See Abraham, supra*, 559 F.2d at 253; *Brennan's, supra*, at 172. Further, if in deciding disqualification questions courts routinely inquired into the contents of the information exchanged between attorney and client, that would result in the disclosure of the very materials that should remain secret. *Kitchin, supra*, at 904; *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562, 571 (2d Cir. 1973).

Accordingly, the "substantial relationship" test is an indirect mechanism for establishing the likelihood that confidential information was exchanged, without taking direct testimony about the contents of that information. In deciding whether such a relationship exists, the judge must make a "realistic appraisal of the possibility that confidences [have] been disclosed in the one matter which will be harmful to the client in the other." *Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 225 (7th Cir. 1978). That is,

. . . where 'it can reasonably be said that in the course of the former representation the attorney *might* have acquired information related to the subject matter of his subsequent representation,' *T. C. Theatre Corp.* [*v. Warner Bros. Pictures*, 113 F.Supp. 265 (S.D.N.Y.1953)], *supra*, at 269 (emphasis supplied), it is the court's duty to order the attorney disqualified.

*Emle Industries, supra*, 478 F.2d at 571; *accord The NCK Organization Ltd. v. Bregman*, 542 F.2d 128, 134 (2d Cir. 1976). Disqualification must follow without regard to whether someone other than the attorney may also have been privy to the information. *Brennan's, supra*, at 172; *NCK Organization, supra*, 542 F.2d at 133.

With these guidelines in mind, I must determine whether Klein or Rouse represented NOF on matters that are sub-

stantially related to the matters at issue in the instant lawsuits. If such a relationship exists with regard to either attorney, the entire law firm of Klein and Rouse should be disqualified from representing Mark Smith in this case. *Kitchin, supra*, at 904.

### B. Henry Klein's representation of the homestead

Henry Klein represented or was consulted by NOF on several matters. In some instances, Klein worked on things that have no real connection to the instant lawsuit. For example, he represented NOF in a dispute with the homestead's landlord.

### (1) The Cease and Desist Order

■ Prior to March, 1976, the Federal Home Loan Bank Board had looked into certain practices or acts on the part of NOF and some of its personnel. The FHLBB ultimately issued a Cease and Desist Order, to which the homestead consented. Klein participated in negotiations with counsel for the FHLBB prior to the issuance of the Order. He reported about those negotiations to David Gatto and Mark Smith, in their capacities as President and Chairman of the Board of the homestead, respectively. Klein advised them about the situation facing the homestead because of the illegal practices or acts that the FHLBB considered to have taken place. In the words of David Gatto, Klein counselled them on their "options" and on the "possible circumstances or the difficulties that we might have to face."

The Cease and Desist Order with regard to which Klein thus served the homestead constitutes one of the reasons for the removal of Mark Smith as a Director on November 22, 1978. The Order was based largely on what the FHLBB considered to be improprieties on the part of Mark Smith. The November 22 Resolution removing Smith from the Board charged that Smith's improper conduct was "the principal and motivating cause" for the issuance of the Cease and Desist Order.

In the instant lawsuits, Mark Smith, represented by Klein, attacks that Resolution and the causes for removal that it recites. Klein, however, served the homestead with regard to a matter that constitutes one of those causes. Therein lies a "substantial relationship" calling for disqualification of Klein. While acting for the homestead, Klein was in a position to acquire information on a subject that is now at the heart of litigation his client has brought against the homestead.

### (2) The Tall Pines matter

Klein also represented NOF in what may be called the Tall Pines matter. A subsidiary of NOF had made loan commitments on certain lots in a subdivision being developed by a corporation called Tall Pines, Inc. A subsidiary of the First National Bank of New Orleans held a first mortgage on the land and was about to foreclose. It held about $126,000 as security on the project in favor of the NOF subsidiary, which money NOF stood to lose because of the foreclosure. According to Klein, his work for NOF was devoted solely to defeating the foreclosure and negotiating for the release of some of the $126,000.

Mark Smith's sister had a substantial ownership interest in Tall Pines, Inc. In the Notice of Charges accompanying the Cease and Desist Order in March, 1976, the FHLBB cited NOF's involvement with this corporation as an example of improper conflict of interest. The Resolution of November 22, 1978, that removed Mark Smith as a Director was based, in part, on such conduct by Smith that had led to the Cease and Desist Order.

Because the alleged improprieties of Mark Smith, and the defendants' attitudes with respect to them, are disputed issues before the court in this case, the defendants contend that there is a substantial relationship between Klein's Tall Pines representation of NOF and his current representation of Mark Smith. The defendants claim that Klein did not simply function as a legal technician, addressing solely the issues of real estate law presented, but rather was a counselor whose representation embraced all of the problems raised by the Tall Pines

situation, including Mark Smith's conflict of interest. They contend that Klein's representation was such as would have brought him into contact with information relating to Smith's conflict in the Tall Pines matter and with the thoughts and opinions of various Directors concerning this conflict.

I agree with the defendants. Smith's practices were of real concern to the other Directors. They had been the primary basis for the FHLBB's criticism of NOF in March, 1976. Klein had been involved in NOF's dealing with the FHLBB. During the course of his work on the Tall Pines matter, he was in contact with various Board members, especially David Gatto, President of NOF. Klein states in his affidavit that he cannot recall the specifics of any communications with Gatto, but Gatto testified at his deposition that he did discuss with Klein his attitude toward Smith's involvement in the Tall Pines matter. Gatto's testimony, in conjunction with the background situation I have described, convinces me that Klein's representation went beyond the legal questions presented by the foreclosure and security problems—and encompassed Mark Smith's conflict of interest. Therefore, that representation is substantially related to Klein's current representation. Making a realistic appraisal of the likelihood that information relevant to the instant lawsuits was disclosed during Klein's Tall Pines representation, I must conclude that it is quite likely that such disclosure did take place, and so Klein must be disqualified.

### (3) The securities investigation

Soon after Mark Smith was appointed on October 19, 1978, to the two-man Committee of Directors to investigate the securities transactions, he consulted Henry Klein. Klein and Smith drafted the interrogatories that Smith served on the members of the Board of NOF. These interrogatories consisted of eight pages of detailed questions concerning the securities transactions. They demonstrate considerable effort and research.

On October 24, 1978, the other Board members discovered Klein's involvement in the Committee's investigation, and they requested that Klein stop that involvement until the full Board could approve this work for NOF. Until that moment, however, Klein had been assisting a Committee of homestead Directors—with all the resources available to such a Committee—to investigate the very securities transactions that form an integral part of the lawsuits his client has now brought against NOF and its Directors. The defendants must answer charges concerning the securities transaction brought by a man whose attorney, while working for the homestead, helped research and draft a searching series of interrogatories on that very subject. The relationship between the past and the current representations is substantial. Disqualification must follow.

### (4) The October 24, 1978, meeting

■ On October 24, 1978, Klein was at the law offices of Kavanaugh and Talley. Klein spoke with Ray Talley, and then the two went down the hall to Joseph Kavanaugh's office, where they encountered David Gatto, Conrad Franz, and Kavanaugh. The defendants have testified that Klein indicated to them that he was not there representing Mark Smith, and on the basis of this representation they discussed the recent removal of Mark Smith in Klein's presence. They argue that Klein's exposure to the information discussed at this meeting disqualifies him as Smith's attorney in the instant lawsuits.

Defendants, however, have not established that Klein was "representing" them or NOF in any matter when he was allegedly privy to this private discussion. Thus, no substantial relationship between a former representation and the current one can be established, and there exists no presumption that Klein was privy to information disclosed by the former client. These special circumstances call for an inquiry into whether in fact Klein actually was privy to confidential information. That inquiry requires examination of the contents of the information allegedly disclosed. *Compare Abraham, supra.*

At the depositions taken in this matter, the parties, under my instructions, did not go into the contents of the information allegedly disclosed to Mark Smith's current counsel. Because disqualification of that counsel is required on other grounds not requiring examination of those contents, a full factual inquiry on this point is not appropriate and will not now be undertaken.

C. Gary Rouse's representation of the homestead

From late October, 1972, until May, 1976, Gary Rouse was a salaried associate of the law firm of Kavanaugh and Talley. Ray Talley and Joseph Kavanaugh, partners in that firm, were and still are Directors of NOF. The firm handles the day to day legal business of the homestead, and while there Rouse worked on several routine legal matters that are unrelated to the instant lawsuits—for example, defending NOF in a redhibitory action brought by the buyer of a home the purchase of which NOF had financed.

(1) The garnishment of Mark Smith's accounts

■ In March, 1976, while working for Kavanaugh and Talley, Rouse prepared and filed, on behalf of NOF, answers to garnishment interrogatories filed by the First Bank of Slidell, Louisiana. The answers were signed by Ralph Hosch, Controller of NOF. One answer revealed the existence of a savings account in Mark Smith's name, which account was subsequently garnished by the bank.

The defendants point out that in his action to remove the current Directors, Smith complains that the existence of his savings accounts at NOF was wrongfully disclosed. They argue that the firm of Klein and Rouse should not be allowed to represent Smith because of Rouse's prior work on an answer to a garnishment interrogatory that revealed one such account.

I find the relationship between the prior and current representations to be far less than substantial. Smith complains that certain Directors, in a concerted effort to have his savings accounts closed, disclosed the existence of those accounts, facilitated and expedited their seizure, and then wrongfully refused to allow Smith to open new accounts—thus preventing him from being qualified to be a Director. Smith's contentions employ the plural word "accounts," implying that more than one account was involved in this scheme. Movers have not established that the particular account revealed in the answer prepared by Rouse is one with which Smith's contentions are concerned. Even if it is, disclosure is only one aspect of what Smith alleges to be a concerted plan to have his accounts closed. Smith may well not contest the disclosure of the particular account mentioned in the interrogatory answer, while accusing the defendants of other improper acts with regard to it. Moreover, in no event can it be said that Gary Rouse's representation has any significant connection to this multi-faceted claim by Smith. In the course of preparing answers to a set of questions, Rouse provided one small answer that relates to a part of Mark Smith's wide-ranging claims. That is insufficient to constitute a ground for disqualification.

IV. THE POSSIBLE ROLE OF MESSRS. KLEIN AND ROUSE AS WITNESSES IN THE INSTANT CASE

A. The legal standards to be applied

■ This part of the motion to disqualify is based upon DR5–102(B) of the Code of Professional Responsibility:[1]

If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client.

Testimony is considered prejudicial under this rule if it is so adverse to the client's

---

1. I apply this provision of the Code of Responsibility, which, technically, is not a rule of law that I must follow, because I believe it is appropriate for me to do so as part of my general supervisory authority over the lawyers and the litigation before me. *Greenebaum-Mountain Mortgage Co. v. Pioneer National Title Ins. Co.,* 421 F.Supp. 1348, 1351 (D.Colo.1976). *See generally Woods v. Covington County Bank,* 537 F.2d 804 (5th Cir. 1976).

side that "the bar or the client might have an interest . . . in discrediting that testimony." *Freeman v. Kulicke & Soffa Industries, Inc.*, 449 F.Supp. 974 (E.D.Pa. 1978). The rule is concerned that in such a situation, the trial counsel, because of his connection with the lawyer on the witness stand, might be inhibited from attacking vigorously the credibility of the testimony. *Freeman, supra.* The mover has the burden of demonstrating with specificity that prejudice will or may occur. *Freeman, supra.*

B. Henry Klein as a potential witness

(1) The legal fee for the Tall Pines representation

■ Henry Klein received a fee of $12,000 from the homestead for his work on the Tall Pines matter. The defendants claim that some of that money was in reality payment for services rendered to Mark Smith personally, and not to NOF. They point to this incident as an example of the misappropriation with which Smith was charged in the Resolution of November 22 that removed him as a Director. They argue that Klein will be called to testify at trial in their favor on this point.

Defendants have made no showing, however, that Klein's testimony will be adverse to Mark Smith. In addition to legal research and the filing of a suit in state court, Klein apparently conducted high-level, difficult negotiations with the attorneys for the First National Bank of Commerce in an effort to recover the $126,000 that NOF had at stake. Klein will likely testify that these efforts (and their results) justified the $12,000 legal fee. He therefore cannot be disqualified on this ground.

(2) The Directors' attitudes toward Smith's involvement in the Tall Pines matter

The defendants argue that Henry Klein, having been privy to their attitudes concerning Mark Smith's conflict of interest in the Tall Pines matter, will be called to testify on this point. They claim that Klein will testify that the Directors were truly concerned over Smith's improper conduct—thus refuting Smith's contentions about the improper, bad-faith motivations of the Directors.

Again, however, defendants have not carried their burden. Henry Klein's deposition has not even been taken. There is no direct evidence about what he would say if he were called to the stand. David Gatto testified in his deposition that he had talked to Henry Klein about his attitudes toward Smith's role in the Tall Pines matter. In other portions of his deposition, Gatto expressed concern that Smith's conduct was improper and damaging to NOF. However, Klein may have an entirely different version of their conversation. He may testify that Gatto was not concerned about the homestead's position at all. Klein may testify that although Gatto did express such concern, he immediately turned to a search for legal solutions to NOF's problems and never mentioned that disciplinary action against Smith would be appropriate. Accordingly, Klein cannot be disqualified on this basis.

Klein's disqualification under Canons 4 and 9 is an entirely separate matter. The DR5–102(B) claim requires that the movers show on what side of the case Klein's testimony would fall. Under Canons 4 and 9, the *Abraham* rule generally forbids inquiry into the contents of the information. It is sufficient if the relationship between the two representations makes it likely that confidences of *any* nature were exchanged, such that the lawyer would be in a position to be affected by them or to use them in any manner in any phase of the later representation.[2]

---

**2.** The court in *Emle Industries, supra*, discussed the various ways in which the prior confidences affect the later representation:

Even the most rigorous self-discipline might not prevent a lawyer from unconsciously using or manipulating a confidence acquired in the earlier representation . . . . Or, out of an excess of good faith, a lawyer might bend too far in the opposite direction, refraining from seizing a legitimate opportunity for fear that such a tactic might give rise to an appearance of impropriety. In neither event would the litigant's or the public's interest be well served.

478 F.2d at 571.

C. Gary Rouse as a potential witness

(1) The garnishment of Smith's savings accounts

As noted earlier, in March, 1976, Gary Rouse prepared certain answers to garnishment interrogatories that revealed, *inter alia*, the existence of one savings account Mark Smith had at NOF. The defendants argue here that since Smith alleges that the closing of his accounts at NOF was the product of a concerted effort by certain Directors, they may call Gary Rouse to prove that First Bank was made aware of Smith's account through an independent source long before the actual seizure in December, 1978.

Defendants' argument for disqualification on this point fails for several reasons. First, Rouse's role was so insignificant that I cannot perceive any real likelihood of his being called as a witness. Second, it is not clear that the answer prepared by Rouse is relevant to the case at all. As explained earlier, Smith's contentions may be directed toward savings accounts other than the one disclosed in the answer prepared by Rouse. Or, he may not complain of the disclosure of this account, but rather other action of the Directors with regard to it.