PENNWALT CORPORATION, Plaintiff,

v.

PLOUGH, INC., Defendant.

Civ. A. No. 79–226.

United States District Court,
D. Delaware.

Jan. 18, 1980.

Richard D. Allen, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Matthew J. Broderick, Aaron C. F. Finkbiner, III, and John M. Coleman, Dechert, Price & Rhoads, Philadelphia, Pa., for plaintiff.

Joseph A. Rosenthal, Morris & Rosenthal, Wilmington, Del., Donald H. Green and Judith E. Lesser, Wald, Harkrader & Ross, Washington, D. C., for defendant.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

The issue presented is whether plaintiff's counsel should be disqualified from further participation in this Lanham Act, 15 U.S.C. § 1125(a), action by reason of its representation of defendant's sister corporation, Scholl, Inc. ("Scholl"), in an anti-trust suit. A chronological statement of largely uncontested facts is essential to an understanding of the conclusion that defendant's motion to disqualify should be denied.

The Philadelphia law firm[1] of Dechert, Price & Rhoads ("DP&R") has been plaintiff Pennwalt Corporation's ("Pennwalt") primary and lead outside litigation counsel continuously since 1956. (Doc. 51, at ¶ 1). In 1977, Pennwalt, a manufacturer of an athlete's foot remedy, DESENEX, became unhappy with the comparative advertising claims made by defendant Plough, Inc. ("Plough") with respect to its athlete's foot remedy, "AFTATE." The parties, with in-house and outside legal counsel including DP&R attorneys Matthew Broderick and Aaron Finkbiner, met on June 16, 1977.

(Doc. 51, ¶ 5). At that meeting, Pennwalt reiterated its intention first stated on May 18, 1977 (Doc. 51, ¶ 3) to institute suit against Plough if the challenged advertisements were not stopped. Michael Pietrangelo, house counsel and Vice-President of Plough and Associate General Counsel of Schering-Plough Corporation ("Schering-Plough"), also attended the June 16, 1977 meeting. By letter dated July 5, 1977, over the signature of Pietrangelo, Plough, after stating its advertising claims were proper, undertook to terminate certain offending commercials, reserving the right to engage in comparative advertising in the future. (Doc. 76, Exh. J).

Plough did not run the offending advertisements in 1978. (Doc. 73, ¶ 7). Instead, it took the offensive by filing challenges with the three national television networks to Pennwalt's "nothing is better than DESENEX" advertisement. Pennwalt did not use the services of DP&R, instead opting to retain a specialist in network television advertising challenge procedures in defending against Plough's network challenge to Pennwalt's advertising.

A then unrelated event, but nonetheless one of considerable portent to the present motion, took place in 1978. In June of that year, DP&R undertook in the Eastern District of Pennsylvania to defend Scholl, along with four other shoe manufacturers and an employee of one of them, in a matter styled *The Shoe Barn Ltd. v. Acme Boot Co., Inc., et al.*, C.A.No. 78–1666. (Doc. 52, ¶ 1). *Shoe Barn* is an anti-trust case filed by a plaintiff who alleges a conspiracy to refuse to deal and to fix resale prices of shoes by roughly 100 named defendants. (Doc. 52, 57¶ 1 and 2). At that time Scholl was headquartered in Chicago operating two divisions, footwear and footcare, with one legal department servicing both divisions. (Doc. 62, ¶ 10). But for follow-up billing reminders by the accounting department of DP&R, all DP&R communications with Scholl have been by two attorneys of

---

1. DP&R also maintains offices in Washington, D.C., Harrisburg, Pennsylvania, Denver, Colorado, Brussels, Belgium and London, England.

DP&R, Henry Kolowrat and Jean Weyman Burns. (Doc. 52, ¶ 6). All of the Kolowrat and Burns communications with Scholl until their withdrawal as counsel for Scholl in the *Shoe Barn* case have been limited to the operating personnel of Scholl's footwear division, Scholl's accountants, Scholl's inside counsel still located in Chicago, and Scholl's outside referral counsel, Henry L. Mason of the Chicago law firm of Sidley & Austin. (Doc. 52, ¶ 6). Mr. Kolowrat and Ms. Burns during the course of their representation of Scholl never obtained any information concerning Schering-Plough or Plough or any of their activities and in fact never had any communications of any kind with either Schering-Plough or Plough. *Id.*

On April 2, 1979, Schering-Plough acquired Scholl as a wholly owned subsidiary. (Doc. 62, ¶ 2). Since Plough was already a wholly-owned subsidiary of Schering-Plough, Scholl and Plough became sister corporations as of that date with some overlap of boards of directors and officers.[2] On May 11, 1979, DP&R filed this lawsuit on behalf of Pennwalt against Plough charging it with false, misleading and deceptive advertising claims with respect to its athlete's foot remedy AFTATE vis-a-vis Pennwalt's DESENEX, all in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), as well as pendent state-law violations. While DP&R did not know Scholl, the corporation it had been defending in the anti-trust litigation since June 1978, and Plough, the corporation it sued on May 11, 1979, were sister corporations on that date, it became aware that Scholl had been purchased by Schering-Plough around the end of May, 1979. (Doc. 79, p. 50).

DP&R never informed either Scholl or Pennwalt that it was acting on behalf of one sister corporation and against the other. Instead, Pietrangelo, who undoubtedly knew of DP&R's representation of Pennwalt against Plough in the instant litigation in May 1979, learned of DP&R's representation of Scholl in October 1979 when a statement for legal services from DP&R to Scholl came to his attention as the individual having principal legal responsibility for Schering-Plough's U. S. Consumer Operations Division. Scholl was placed in that division on the date of its acquisition by Schering-Plough. Plough was already a member of that division. (Doc. 62, ¶ 2).

Pietrangelo's late acquisition of knowledge of DP&R's representation of Scholl is explained by the fact that in June 1979 he began preliminary steps to consolidate the Scholl legal services and staff into the legal department of the division in Memphis, Tennessee, which included among other things institution of a new reporting system requiring all Scholl legal matters to be reported directly to him. (Doc. 62, ¶¶ 5 and 6). Scholl, while still headquartered in Chicago, will, by the end of 1980, complete a move to the Memphis facility where the division and Plough are located. (Doc. 62, ¶ 3). According to Pietrangelo, "[t]here is and will continue to be one legal department with six attorneys handling the legal problems of the Schering-Plough U. S. Consumer Operations Division. Communications with counsel representing Scholl in the *Shoe Barn* case, and with counsel representing Plough in the present case, have been and will continue to be made through the Division's legal department, all under my general authority and supervision. Inside counsel at Scholl headquarters in Chicago, who had previously worked exclusively on Scholl matters, including the *Shoe Barn* case, will now be working on a variety of Schering-Plough U. S. Consumer Operations Division matters and will soon relocate to the Division's headquarters in Memphis, . . . ." (Doc. 62, ¶ 9). Further, "[u]nder the current organization of legal services for the Schering-Plough U. S. Consumer Operations Division of which Scholl

---

**2.** On the date of the acquisition, R. Lee Jenkins, Senior Vice-President and officer of Shering-Plough and Chief Executive Officer and Director of Plough, became an officer and director of Scholl. In like fashion, William H. Scholl became a director of Schering-Plough sometime between April 2 and May 11, 1979 and an officer of the same corporation on July 1, 1979. In addition, as of April 2, 1979, Michael A. Pietrangelo, a Vice-President and Secretary of Plough, became an officer of Scholl.

is part, there is still no separation made between foot care and foot wear legal matters." (Doc. 62, ¶ 10). Finally, there is accepted for purposes of this disqualification motion the fact that "[t]he U. S. Consumer Operations Division of Schering-Plough is currently considering the marketing through Scholl of a new non-prescription athlete's foot product line. Products in this line will in all probability contain tolnaftate, the same medication as in Plough's AFTATE, which Dechert Price and Rhoads' client Pennwalt is attacking in this litigation." (Doc. 62, ¶ 11).

Pietrangelo's discovery of DP&R's representation of Scholl was brought to the attention of Donald Green, of the Washington, D. C. law firm[3] of Wald, Harkrader & Ross, who in turn raised the matter directly with DP&R. Thereafter, there followed an increasingly acrimonious exchange of correspondence (Doc. 54, Exhs. A, B, D, E and F),[4] highlighted by the following: DP&R took the position there was no ethical conflict; defendant Plough unilaterally terminated all discovery without benefit of court order; DP&R offered to withdraw as counsel for Scholl if requested; Schering-Plough (a non-party to the litigation involving its wholly-owned subsidiaries, Plough and Scholl) requested in writing that DP&R withdraw from its representation of Pennwalt in the instant litigation against Plough and specifically did not request that DP&R withdraw in the Scholl litigation (Doc. 62, Attachment 1); DP&R responded to Schering-Plough, advising it no longer desired to represent Scholl (Doc. 62, Attachment 2); Schering-Plough took the position DP&R had violated the American Bar Association Code of Ethics, which could only be cured by withdrawal from representation of Pennwalt in the matter *sub judice*, and refused to permit DP&R to withdraw from the *Shoe Barn* litigation. (Doc. 71, Exh. I).

The above deterioration of relationships culminated with DP&R's filing a motion to withdraw from its Scholl representation in the Eastern District of Pennsylvania. During oral argument on the disqualification motion in this district, DP&R, while disputing it was currently in a conflict position, candidly acknowledged it would inevitably be in a conflict situation in the future (Doc. 79, p. 40–41) if it were not permitted to withdraw in the Scholl litigation. Subsequently, Scholl's response to the DP&R motion to withdraw in the Eastern District of Pennsylvania was to request deferral of a ruling on DP&R's withdrawal request until this Court ruled on Plough's disqualification motion. On December 28, 1979, DP&R's motion to withdraw in the Scholl litigation was granted.

Resolution of charges of unethical conduct arising from concurrent representation of sister corporations is necessarily approached with caution. The proliferation of national or multi-national public corporations owning or partially owning subsidiaries which may also be national or multi-national, the spawning of varied types of corporate affiliates, and the creation of joint ventures yield an infinite variety of potential disqualification problems. The potential for inadvertent unethical conduct is exacerbated by the pronounced trend toward national and international law firms.

While caution is counseled, timidity is eschewed. Where ethical impropriety is charged and disqualification sought, "judges are in effect the caryatids charged with upholding the highest of ethical standards in the legal profession." *Silver Chrysler Plymouth, Inc. v. Chrysler Mot. Corp.*, 518 F.2d 751, 759 (2d Cir. 1975). It is the judge's duty to be vigilant to retention and restoration of public trust in the integrity of the bar. Thus, the Court's obligation in resolving questions of ethics is owed not only to Plough and Pennwalt and their respective law firms, but to the profession and the public. *See Emle Industries, Inc. v.*

---

**3.** The Wald, Harkrader & Ross law firm also has an office in Dallas, Texas.

**4.** While briefs and exhibits attached thereto are technically not part of the record, they have been alluded to in the interest of detailing a full exposition of what has occurred and with the knowledge that all facts are, for the most part, uncontested, much less rebutted.

*Patentex, Inc.*, 478 F.2d 562, 575 (2d Cir. 1973).

Plough and Pennwalt urge diametrically opposed positions. Plough, citing *International Business Machines Corp. v. Levin*, 579 F.2d 271 (3d Cir. 1978), urges a rule of *per se* disqualification absent DP&R having obtained consent from Pennwalt and Scholl. (Doc. 79, p. 35). It argues "Dechert Price & Rhoads, by representing Scholl, also has a duty of loyalty to Scholl's affiliates. When two corporations are subject to common ownership and control, any injury or risk of injury to one will necessarily cause injury or risk to the other. The duty of undivided loyalty thus requires an attorney to refrain from taking an adversary posture toward one corporation while simultaneously representing its affiliate unless, at a minimum, the attorney has first obtained informed client consent." (Doc. 74, p. 7). At oral argument Plough succinctly summarized its position by graphically stating: ". . . if you scratch Plough, Scholl bleeds." (Doc. 79, p. 10). In response, Pennwalt urges the filing of the disqualification motion accompanied by Plough's refusal to engage in further discovery was nothing more than a litigation ploy designed to frustrate a December 31, 1979 termination of discovery date. It points out that before any duty can be owed to any entity, DP&R must have at least represented that entity. Having never represented the parent, Schering-Plough, or the sister corporation, Plough, DP&R concludes it has violated no ethical duty. Further, it asserts Schering-Plough purchased a conflict when it bought Scholl for which its client Pennwalt should not have to pay by suffering disqualification of its counsel in the matter *sub judice.*

The starting point for any analysis is the Code of Professional Responsibility ("Code"), comprised of Canons, Ethical Considerations ("EC") and Disciplinary Rules ("DR"), adopted by the American Bar Association.[5] *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 227 n.2 (2d Cir. 1977); *Wilson P. Abraham Const. v. Armco Steel Corp.*, 559 F.2d 250, 252 (5th Cir. 1977). Of primary importance to resolution of Plough's disqualification motion are Canon 4,[6] Canon 5[7] and DR 5–105 formulated thereunder and Canon 9.[8]

■ The basic positions espoused by Plough and Pennwalt are rejected. The urged prophylactic rule for disqualification where there is concurrent dual representation of sister corporations cannot be accepted for the simple factual reason that DP&R has never represented Plough or Schering-Plough. Vigorous advocacy cannot change the fact that Scholl is a corporate entity distinct from Plough and Schering-Plough. Similarly, Pennwalt's claim that the ethicality of its position is unassailable because it never represented the "client," Plough or Schering-Plough is overly broad. Representation under the Code has been prohibited in varied circumstances even though the attorney-client relationship never existed. *See Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225 (2d Cir. 1977) (law firm which had never represented auditor held to be disqualified in litigation against auditor where firm was retained through auditor's regional counsel and was in a position to receive confidential information); *Whiting Corp. v. White Machinery Corp.*, 567 F.2d 713 (7th Cir. 1977) (motion to disqualify plaintiff's law firm denied but law firm's representation of non-party

---

5. In working with the Code it is kept in mind that the Canons are "axiomatic norms expressing in general terms the standards of professional conduct expected of lawyers in their relationship with the public, with the legal system, and with the legal profession." The Ethical Considerations are "aspirational in character and represent the objectives toward which every member of the profession should strive." Unlike the Ethical Considerations, the Disciplinary Rules are mandatory in character, setting forth "the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." . Code-Preliminary Statement.

6. "A lawyer should preserve the confidences and secrets of a client."

7. "A lawyer should exercise independent professional judgment on behalf of a client."

8. "A lawyer should avoid even the appearance of professional impropriety."

touching upon the subject matter of litigation ordered curtailed where non-party corporation owned 20% of the stock and appointed 40% of the Board of Directors of defendant); *Wilson P. Abraham Const. v. Armco Steel Corp.*, 559 F.2d 250 (5th Cir. 1977) (remand required to ascertain whether past and present actions were substantially related and whether confidential information had been divulged between counsel in prior action where plaintiff's counsel in civil anti-trust action was proceeding against a codefendant of a former client in a concluded criminal anti-trust action); *but see Fred Weber, Inc. v. Shell Oil Co.*, 566 F.2d 602 (8th Cir. 1977), *cert. denied*, 436 U.S. 905, 98 S.Ct. 2235, 56 L.Ed.2d 403 (1978) (plaintiff's attorney in civil anti-trust action not disqualified by reason of his prior representation of a codefendant of defendant in concluded criminal anti-trust action where the two actions were substantially related, but, because of absence of attorney-client relationship, there was no binding presumption of shared confidential information).

■ In my view, striving to determine whether to affix the label of "client" obscures what must be the basic inquiry where a question of the ethicality of the representation of an attorney or his law firm has arisen: Does or will the complained of conduct violate the ultimate objective of each of the Canons considered separately, and of the Code considered in its entirety? The Canons, Ethical Considerations and Disciplinary Rules serve as a comprehensive guide providing the Bar with standards of conduct expressed as axiomatic norms, aspirational objectives and mandatory minimum levels of conduct respectively. Obviously, no Code could be drafted which would address all of the problems and possible permutations and combinations of relationships between lawyers and their clients, colleagues, and the public in a changing society. Instead, it establishes general guidelines against which proposed and actual conduct can be evaluated.

Having eschewed labels as a means of resolving attorney disqualification controversies, *cf. Fund of Funds, Ltd. v. Arthur Andersen & Co.*, supra at 235, and having rejected plaintiff's *per se* rule that counsel cannot concurrently defend one sister corporation while suing another without having first obtained the consent of both plaintiff and the sister corporation it represents, a means of resolution must be chosen. The chosen mode of analysis is to carefully sift "all of the facts and circumstances," *Akerly v. Red Barn System, Inc.*, 551 F.2d 539, 543 (3d Cir. 1977), and weigh the same against the specific goals and objectives of the Canons.[9]

■ Canon 4 provides "A Lawyer Should Preserve the Confidences and Secrets of a Client." The ethical precept underlying Canon 4 is broader than the evidentiary attorney-client privilege, existing without regard to the source of the information or the fact that others share the knowledge. (EC 4-4). While broader than the attorney-client privilege, the privilege complements the Canon. Together they reflect a societal judgment that in order for our legal system to function, clients must be free to divulge confidences to lawyers and preservation of that confidence is more important than the search for truth. *See Fred Weber, Inc. v. Shell Oil Co.*, supra, at 607. All information acquired by the attorney during the course of the representation of a client is sheltered and may not be used to the disadvantage of a client except under specified circumstances. *Brennan's Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168, 172 (5th Cir. 1979). The clear underlying goal and objective of Canon 4 is to prevent use of confidential information acquired from any source during the course of the representation of a client where such use

---

**9.** The facts and circumstances were previously set forth, pp. 265–267. Virtually all facts were uncontested. The facts were set forth by affidavit or, in the case of exhibits, were sometimes attached to briefs, but nonetheless considered by the Court. See n.4, *supra*. Opposing counsel demonstrated a thorough familiarity with the case law at the hearing on the disqualification motion. Neither litigant requested an evidentiary hearing. *Cf. Emle Industries, Inc. v. Patentex, Inc.*, supra, 478 F.2d at 574 n.9.

would ultimately result in the incurring of a detriment or disadvantage by that client. In short, the attorney is enjoined to preserve the confidences of his client. The rationale for unyielding, rigid enforcement of sheltering of confidential information was set out in *Emle Industries v. Patentex, supra* at 570–71, a case where an attorney was suing a former client.

> Without strict enforcement . . . , a client would hardly be inclined to discuss his problems freely and in depth with his lawyer, for he would justifiably fear that information he reveals to his lawyer on one day may be used against him on the next. A lawyer's good faith, although essential in all his professional activity, is, nevertheless, an inadequate safeguard when standing alone. Even the most rigorous self-discipline might not prevent a lawyer from unconsciously using or manipulating a confidence acquired in the earlier representation and transforming it into a telling advantage in the subsequent litigation. Or, out of an excess of good faith, a lawyer might bend too far in the opposite direction, refraining from seizing a legitimate opportunity for fear that such a tactic might give rise to an appearance of impropriety. In neither event would the litigant's or the public's interest be well served. The dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case. These considerations require application of a strict prophylactic rule to prevent any possibility, however slight, that confidential information acquired from a client during a previous relationship may subsequently be used to the client's disadvantage.

Application of Canon 4 most often occurs in "prior representation" cases. While the case *sub judice* is not a "prior representation" case, there would be no hesitation to find DP&R disqualified if that firm could not pass the widely adopted "substantial relationship" test analogized to

concurrent representation of sister corporations by modifying the language, though not the lesson, of *Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 224 (7th Cir. 1978) (footnote and citation omitted).

> [T]he determination of whether there is a substantial relationship turns on the possibility, or appearance thereof, that confidential information might have been given to the attorney in relation to the . . matter in which disqualification is sought. The rule thus does not necessarily involve any inquiry into the imponderables involved in the degree of relationship between the two matters but instead involves a realistic appraisal of the possibility that confidences had been disclosed in the one matter which will be harmful to the client in the other. The effect of the Canons is necessarily to restrict the inquiry to the possibility of disclosure; it is not appropriate for the court to inquire into whether actual confidences were disclosed.

> The substantial relationship test is not a rule of substantive law but a measure of the quantum of evidence required for proof of the existence of the professional obligation. . . . The evidence need only establish the scope of the legal representation and not the actual receipt of the allegedly relevant confidential information. Then only where it is clearly discernible, "that the issues involved in a current case do not relate to matters in which the attorney . . . represent[s] the [sister corporation] will the attorney's present representation be treated as measuring up to the standard of legal ethics."

Analogizing to the substantial relationship test, it is found that the subject matter of the *Shoe Barn* litigation is not related to the instant litigation. It is realistic to infer that the Scholl staff and Scholl attorneys still based in Chicago and with whom DP&R communicated have provided confidential information with respect to Scholl and its footwear products in defense of the anti-trust litigation. However, it is unrealistic to conclude that any of the confidential

information provided by Scholl is relevant to any issue in this Lanham Act litigation involving the relative merits of athlete's foot remedies. DP&R having received no confidential information from Scholl relevant to the instant litigation, it is found there has been no violation of Canon 4 prior to December 28, 1979, the date of DP&R's withdrawal as counsel for Scholl.

■ One can persuasively argue that DP&R's defense of Scholl until permitted to withdraw and representation of Pennwalt against Plough must be viewed as concurrent, in that both were occurring at the same time. Canon 5 provides "A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client." Applicable Disciplinary Rules are DR 5–105(A), (B) and (C) which state:

DR 5–105(A):

> A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

DR 5–105(B):

> A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

DR 5–105(C):

> In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

Undivided and undiluted loyalty are the lawyer's talismans under Canon 5. As a consequence, the fact that the concurrent representation involving the same client is in unrelated fields does not absolve the lawyer of a Canon 5 violation. *International Business Machines Corp. v. Levin, supra.* The underlying loyalty standard of Canon 5 as applied in concurrent dual representation cases is a higher standard than the "substantially related" test of Canon 4, which has been restricted to prior representation cases. *Id.* at 280. In *Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384, 1387 (2d Cir. 1976), the Court stated "that the 'substantial relationship' test does not set a sufficiently high standard by which the necessity for disqualification should be determined. That test may properly be applied only where the representation of a former client has been terminated and the parameters of such relationship have been fixed. Where the relationship is a continuing one, adverse representation is prima facie improper, . . . and the attorney must be prepared to show, at the very least, that there will be no actual or *apparent* conflict in loyalties or diminution in the vigor of his representation." (Citation omitted; emphasis in original.)

The refusal in *International Business Machines Corp. v. Levin* and *Cinema 5, Ltd. v. Cinerama, Inc.,* to consider the subject matter of each representation teaches that the underlying purpose of Canon 5 is to ensure the absolute and unfettered loyalty of an attorney to a particular client. All the responsibilities and decisions entrusted to the attorney, such as the force with which an argument is pressed or the recommendation to the client with regard to an offer of settlement, cannot and must not be influenced in even the slightest measure by considerations of the attorney's future relations with his client's adversary. Conscious calculation by the attorney is not alone prohibited; the very threat of divided loyalty is a basis for disqualification under Canon 5.

In assessing whether this threat exists in circumstances such as those presented here,

the Court properly may examine the relationship between the sister corporations. The object of this inquiry is not to determine whether Plough can be affixed with the label "client." Rather, it is to gauge the degree, if any, to which DP&R's representation of either Pennwalt or Scholl may be influenced by a regard for the alternate client's welfare.

Until it moved to withdraw as Scholl's counsel, the record conclusively demonstrates that DP&R provided both Pennwalt and Scholl with nothing less than undivided and undiluted loyalty with no "actual or apparent conflict in loyalties or diminution in vigor . . . of representation." Unlike the situation in *International Business Machines Corp. v. Levin* where an attorney was suing the same corporate defendant, Scholl and · Plough did not become sister corporations until May 1979, ten months after DP&R undertook the defense of Scholl. Further, the merger of Scholl headquarters, personnel and legal departments is ongoing, with the major move and realignment of staff to be accomplished in 1980. Under these circumstances, it is highly unlikely that as of the date of DP&R's withdrawal of representation of Scholl there was any adverse effect on DP&R's exercise of its independent judgment on behalf of either Pennwalt or Scholl by reason of DP&R's adversary posture toward Scholl's sister corporation, Plough.

If DP&R were not permitted to timely withdraw as counsel for Scholl, it volunteered at oral argument that it would eventually find itself in a conflict position. The DP&R conflict would be caused by the changing circumstances of Scholl, *viz.*, Scholl and Plough were placed in the same division, with the Chief Executive Officer of the division sitting on both boards of directors, and more importantly the upcoming headquarters consolidation with the personnel of one legal department under what will be the active supervision of the same attorney. Having met its burden with respect to the absence of an actual conflict and the withdrawal from the Scholl litigation precluding a conflict certain to occur in the future, DP&R has satisfied its

burden that it has not violated Canon 5 under the peculiar facts and circumstances of this case. In arriving at the holding that Canon 5 has not been violated, the Court does not suggest that counsel may eliminate an *existing* conflict merely by choosing to represent the more favored client and withdrawing its representation of the other. Such conduct is expressly disfavored. Here, no conflict yet existed. DP&R's withdrawal from *Shoe Barn* simply obviated the occurrence of a conflict certain to arise in the future by virtue of the evolving assimilation of Scholl into the Schering-Plough division which contains Plough.

It is emphasized, however, that there could be many situations where withdrawal might not be permitted, *cf., Cinema 5, Ltd. v. Cinerama, Inc., supra* at 1387, or where even though withdrawal occurs, the concern with protecting the integrity of the Bar might nonetheless dictate disqualification. The precise facts and circumstances, as well as the timing involved, would be factors to be assessed in determining whether an ethical violation has or will occur and the appropriate remedial measures for the same.

Canon 9 states "A Lawyer Should Avoid Even the Appearance of Impropriety." Canon 9, unlike Canons 4 and 5, does not reference a client. The articulated tests gaining circuit court approval for disqualification by reason of violation of Canon 9 are:

"[A]n attorney should be disqualified under Canon 9 only when 'there is a reasonable possibility of improper professional conduct' and 'the likelihood of public suspicion or obloquy outweighs the social interests which will be served by a lawyer's continued participation in a particular case.'" *Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1321 (7th Cir.), *cert. denied*, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978) (approving district court formulation, 448 F.Supp. 1304).

and

[U]nder this canon there must be a showing of a reasonable possibility that some

specifically identifiable impropriety in fact occurred and that the likelihood of public suspicion must be weighed against the interest in retaining counsel of one's choice. *Brennan's, Inc. v. Brennan's Restaurants, Inc., supra,* 590 F.2d at 172.

Disqualification of DP&R is not required under either test. On this record there is no "reasonable possibility of improper professional conduct" as articulated in *Westinghouse, supra,* much less a showing of any "specifically identifiable impropriety" as set forth in *Brennan's, Inc., supra.* Further, there is nothing in the record to warrant any public suspicion. It is found DP&R has not violated Canon 9.

In arriving at the conclusion that DP&R has not violated Canons 4, 5 and 9, each was analyzed separately. As stated earlier, due regard must be had for the policies embraced within the Code in its entirety. For example, there is no reason why breach of the duty of undivided loyalty under Canon 5 could not also contravene the prohibition or policies against disclosure of confidential information proscribed by Canon 4. It is difficult to perceive how there could be free, unfettered communications between DP&R and Scholl after the merger of headquarters is completed in 1980, and a small staff of in-house attorneys located at the same physical site and under the active supervision of one attorney are handling both Plough and Scholl matters. Similarly, there would be reasonable grounds to believe there would or could be an "adverse effect" proscribed by DR 5–105(A) and (B). In the case at bar, however, DP&R's conduct has not run afoul of these policies.

The interface between Canon 4 and Canon 5 nevertheless suggests that counsel in concurrent dual representation cases should proceed with the utmost caution. For, while obtaining the consent of both clients

under DR 5–105(C) may make multiple representations permissible under Canon 5, it would not permit the use of confidential information by an attorney against his own client. In fact, a close reading of EC 4–5 would suggest an attorney can never "use information acquired in the course of the representation of the client to the disadvantage of the client" although he can use such information for his own purposes after full disclosure and with consent. *See, Westinghouse Elec. Corp. v. Gulf Oil Corp., supra,* 588 F.2d at 228. Thus, it follows that Plough's proposed prophylactic rule could not work even if it did not have to hurdle the problem of sister or affiliated corporations.

■ While DP&R has been absolved of any ethical infraction, the facts in this case amply illustrate the need for law offices to use the utmost vigilance and, to the extent feasible, make maximum use of current technology as an aid in avoiding potential conflicts. Further, it illustrates how projected changes in mode of internal operation of the client unknown to the attorney can cause a potential for conflict. Given that the duty is upon the attorney to ferret out such conflicts, and not upon the client to divulge them,[10] *Westinghouse Elec. Corp. v. Kerr-McGee Corp., supra,* 580 F.2d at 1321, I have no hesitance in suggesting that a law firm would be well advised to inform both clients in writing as soon as it finds it is, or will be, in an adversarial position as between parent and subsidiary corporations, wholly owned or otherwise, sister corporations, affiliated corporations or joint venturers. Only in that manner can the potential for ethical impropriety be evaluated, if not amicably resolved, at the earliest practicable time. Failure to obtain consent, assuming a consent to be effective,[11] would

---

10. The Court notes that most, if not all, large corporations likely to be involved in the problem here employ house counsel. Like their outside counterparts, house counsels' conduct is governed by the Code. While this case, in which house counsel acted promptly, was not an appropriate vehicle to address the issue, one can reasonably expect that conduct of house counsel will become another factor to be con-

sidered in determining whether an ethical impropriety has occurred. More specifically, it may become necessary to examine whether due diligence by house counsel could have prevented an existing conflict, and if so, whether outside counsel alone must shoulder the responsibility in eliminating the conflict.

11. See discussion at p. 273, *supra.*

not necessarily mean a firm is or should be disqualified. It would, however, alert the litigants and their attorneys to the problem.

Finally, attention is turned to Pennwalt's charge that Plough's disqualification motion was part of a litigation strategem to frustrate a December 31, 1979 termination of discovery date and early trial so as to avoid a possible decision prior to the onset of the next athlete's foot season. There is no question the disqualification problem caused discovery to cease on November 9, 1979, 52 days before the December 31, 1979 discovery cut-off date. As a consequence, an order will be entered extending the termination of discovery until 52 days from the date of this Opinion and Order. While termination of discovery has been delayed and an early trial precluded by reason of the filing of the disqualification motion, the above discussion on the merits answers any contention that the motion was patently frivolous. On the other hand, Scholl's refusal to permit DP&R to withdraw from the *Shoe Barn* case, coupled with its request that the court in *Shoe Barn* defer its ruling on DP&R's motion to withdraw until this Court ruled on the instant motion, is more troubling. DP&R had conceded that if it were not permitted to withdraw as Scholl's counsel, a conflict would inevitably ensue. In light of the disintegrating relationship between DP&R and Scholl evidenced by their correspondence (Doc. 54, Exhs. A, B, D, E and F), one obvious, though not necessarily correct, conclusion would be that Scholl's request for deferral of a ruling in *Shoe Barn* was a Plough-Scholl coordinated attempt to dictate the outcome, or delay issuance of, a decision on the instant motion. If that was the case,[12] an otherwise proper and responsible effort to enforce the Canons was converted into a litigation tactic directly relating to the work of two federal courts. *Cf. Allegaert v. Perot*, 565 F.2d 246, 251 (2d Cir. 1977). It is assumed all concerned will carefully reevaluate their roles as officers of the court.

12. Since Scholl's request in *Shoe Barn* was made after briefing and oral argument on the instant motion, this Court has not heard from the parties on the matter. It may well be that

An order will be entered denying the motion to disqualify DP&R.

Scholl's position was prompted by considerations other than those described above. Similarly, responsibility for Scholl's position cannot be allocated with any degree of certainty.