Grafton
No. 2007-867

PETER GOODRICH & a.

v.

MORGAN GOODRICH & a.

Argued: June 18, 2008
Opinion Issued: December 4, 2008

*Wiggin & Nourie, P.A.*, of Manchester (*Thomas J. Pappas & a.* on the brief, and *Mr. Pappas* orally), for the plaintiffs.

*Clauson Atwood & Spaneas*, of Hanover (*George E. Spaneas* on the brief and orally), for the defendants.

BRODERICK, C.J. This case comes before us on interlocutory appeal from an order, *see* SUP. CT. R. 8, by the Superior Court (*Vaughan*, J.) denying a motion filed by the plaintiffs, Jeffrey and Peter Goodrich, that sought to disqualify the law firm of Clauson Atwood & Spaneas from representing the defendants, Morgan Goodrich, Crystal Goodrich and Attorney K. William Clauson, in the instant litigation. Two questions were transferred:

 A. Did the trial court err, as a matter of law, [by] applying [an] incorrect legal standard [in] determining whether defendants' legal counsel should be disqualified where defendants' counsel had previously represented one of the plaintiffs in the same matter?

 B. Did the trial court err as a matter of fact and law[, when it] determin[ed] that there was no valid attorney-client relationship between defendants' counsel and the corporate plaintiff based upon its finding that the nature of the corporate plaintiff's business today is not sufficiently similar to the nature of its business under its prior ownership when defendants' counsel represented the corporate plaintiff in the same matter?

We answer the first question in the negative, the second question in the affirmative, and vacate both the trial court's order denying the plaintiffs' motion to disqualify and its order denying the plaintiffs' motion to reconsider. We remand for further proceedings consistent with this opinion.

I

The following facts are taken from the interlocutory appeal statement, *see Alonzi v. Northeast Generation Servs. Co.*, 156 N.H. 656, 657 (2008), from the trial court's order, or from our prior opinion involving the same parties, *T&M Assocs. v. Goodrich*, 150 N.H. 161 (2003). The plaintiffs are the sons of defendant Morgan Goodrich and currently own the corporate plaintiff, T&M Associates, Inc. Defendant Crystal Goodrich is Morgan's wife, and defendant Clauson is an attorney at the law firm of Clauson

Atwood & Spaneas (CAS). CAS represents the three defendants and is the law firm that the plaintiffs seek to disqualify.

In 1987, Morgan owned fifty percent of a small surveying firm known as T&M Surveying, Inc. That year, Morgan, Jeffrey, Peter, and three other organizers agreed to create a new company, plaintiff T&M Associates, Inc. (T&M), to provide a broad range of engineering and surveying services. The six organizers of T&M agreed that Morgan would purchase the outstanding shares of T&M Surveying, Inc., transfer fifty-one percent of plaintiff T&M stock to Jeffrey, and retain the remaining forty-nine percent. By agreement, T&M's profits were entrusted to Morgan to invest in retirement accounts for the benefit of each of the organizers. Morgan, Jeffrey and Crystal served as the board of directors of T&M from 1990 until December 2000.

In 1994, Morgan and his two sons entered into a written agreement confirming the earlier agreement that Morgan transfer fifty-one percent of T&M's stock to Jeffrey, and further agreeing that Morgan would transfer the remaining forty-nine percent to Peter at a price to be determined. Morgan did not honor the agreement. In 1998, he told Jeffrey and Peter that he had retained all of T&M's stock as well as all of the company's profits for his own benefit. In November, Morgan and his two sons agreed to negotiate the purchase and sale of his shares in T&M by the end of 2000. If negotiations were unsuccessful, they agreed to revert to the terms of their 1994 agreement with an amendment. In early December 2000, Morgan removed Jeffrey from T&M's board of directors, and later appointed Attorney Clauson as his son's replacement. A week later, the board, which now consisted of Morgan, Crystal and Clauson, voted to terminate both sons from T&M's employment.

T&M then brought an equity action against Jeffrey and Peter alleging, among other things, that they had misappropriated company funds. The sons counterclaimed, alleging misrepresentation, breach of contract, promissory estoppel and quantum meruit. In February 2001, Jeffrey and Peter initiated the civil suit underlying this appeal against T&M, Morgan, Crystal and Clauson, claiming that the vote of the board of directors to terminate their employment was in breach of each board member's fiduciary duties. The suit was stayed pending final resolution of the equity action. CAS represented T&M in both the equity action and the civil action. In 2002, the trial court dismissed T&M's equity claims and ruled in favor of Jeffrey and Peter on their counterclaims, awarding them approximately $1,600,000 in damages. The trial court's decision was affirmed on appeal. *See T&M Assocs.*, 150 N.H. at 166. Morgan and Crystal thereafter initiated bankruptcy proceedings, and the bankruptcy court granted summary judgment in favor of Jeffrey and Peter on civil claims involving Morgan's breach of

their 1994 and 1998 agreements. In 2004, the superior court entered judgment against Morgan on the same claims. That December, Morgan transferred T&M's stock to his sons. Jeffrey and Peter later dismissed T&M as a defendant in the present litigation, originally filed in 2001, and added it as a plaintiff. (Hereinafter, T&M under Morgan's ownership is referred to as "old T&M," and T&M under Jeffrey and Peter's ownership is referred to as "new T&M.")

During a deposition of Attorney Clauson in January 2007, he asserted an attorney-client privilege for certain conversations he had had with old T&M and Morgan while serving as their counsel. In April, the plaintiffs moved to disqualify CAS from further representation of Morgan, Crystal and Clauson pursuant to Rule 1.9 of the New Hampshire Rules of Professional Conduct, alleging that CAS had a conflict of interest due to new T&M's status as a former client of the law firm. At that point, CAS had represented the defendants for more than six years. The trial court denied the plaintiffs' motion, ruling that new T&M, then owned by Jeffrey and Peter, was not a former client of CAS and that the attorney-client privilege had not transferred from old T&M to new T&M in the stock transfer from Morgan to his sons in 2004.

## II

 Attorneys in this state owe a duty to former clients to preserve confidences. They also owe a duty of loyalty. *Sullivan Cnty. Reg. Refuse Dist. v. Town of Acworth*, 141 N.H. 479, 483 (1996). In particular, the applicable version of Rule 1.9(a) of the New Hampshire Rules of Professional Conduct provides that:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation and with knowledge of the consequences.

N.H. R. PROF. CONDUCT 1.9(a) (amended 2007). While Rule 1.9(a) was amended in 2007, the change is not relevant to this appeal. We have established the following test under Rule 1.9(a) to determine whether a disqualifying conflict of interest exists:

> First, there must have been a valid attorney-client relationship between the attorney and the former client. Second, the interests of the present and former clients must be materially adverse. Third, the former client must not have consented, in an informed

manner, to the new representation. Finally, the current matter and the former matter must be the same or substantially related.

*Sullivan Cnty.*, 141 N.H. at 481-82 (citations omitted) (decided under former version). "[U]pon a finding that all of the elements of [former] Rule 1.9 have been satisfied, a court must irrebuttably presume that the attorney acquired confidential information in the former representation." *Id.* at 483. "Disqualification then becomes mandatory." *Id.*

■ The rule of disqualification is designed to protect "a client's secrets and confidences by preventing even the possibility that they will subsequently be used against the client in related litigation." *Tekni-Plex, Inc. v. Meyner and Landis*, 674 N.E.2d 663, 667 (N.Y. 1996). Disqualification, however, "conflicts with the general policy favoring a party's right to representation by counsel of choice, and it deprives current clients of an attorney familiar with the particular matter." *Id.*; *see also McElroy v. Gaffney*, 129 N.H. 382, 390 (1987). We must, therefore, seek to ensure that the trust and loyalty owed by lawyers to their clients are not compromised, while preserving the ability of clients to freely engage counsel of their choice. *See, e.g., Ramada Franchise v. Hotel of Gainesville*, 988 F. Supp. 1460, 1463-64 (N.D. Ga. 1997); *Federal Deposit Ins. Corp. v. Amundson*, 682 F. Supp. 981, 985 (D. Minn. 1988); *In re I Successor Corp.*, 321 B.R. 640, 647 (S.D.N.Y. 2005).

■ No doubt, the potential for abuse exists when a party seeks to disqualify opposing counsel. *McElroy*, 129 N.H. at 390. We share the concern of other jurisdictions that, at times, ethical rules may be used to gain a strategic advantage, rather than as a guide to virtuous and professional behavior, tempering an attorney's zeal for his client. *See id.* at 391; *Amundson*, 682 F. Supp. at 985; *In re I Successor Corp.*, 321 B.R. at 647; *Tekni-Plex*, 674 N.E.2d at 667. Ultimately, "[e]thical questions cannot be resolved by a scientific application of principles and precedents because no code of ethics could establish unalterable rules governing all possible eventualities." *Amundson*, 682 F. Supp. at 985 (quotations and brackets omitted); *see also McElroy*, 129 N.H. at 391; *Tekni-Plex*, 674 N.E.2d at 667. A disqualification motion in the corporate setting, in particular, must be approached with caution in today's increasingly complex corporate maze of parent and subsidiary relationships, mergers and acquisitions. *See, e.g., Ramada*, 988 F. Supp. at 1463-64; *Amundson*, 682 F. Supp. at 985.

The plaintiffs challenge the trial court's ruling that new T&M is not a former client of CAS. They contend that because old T&M's corporate existence never ceased, the trial court erred by considering whether new T&M remained in the engineering and surveying business after the 2004

stock transfer in assessing its former client status. They further contend that even if the nature of new T&M's business is relevant, its engineering and surveying activities ceased at old T&M under the management of Morgan and Crystal, nearly two years prior to the stock transfer. Finally, they contend that the trial court erred because new T&M, in fact, retained the rights, privileges, liabilities and obligations created when old T&M was solely owned by Morgan, and thus would have the authority to exercise or waive the attorney-client privilege regarding confidential communications with CAS.

The defendants argue that the trial court correctly analyzed the "practical consequences" of the stock transfer and properly considered the distinctions between old T&M and new T&M. They contend that because new T&M did not continue the existing operations of old T&M, the attorney-client privilege that old T&M had established with CAS did not pass to new T&M at the time of the stock transfer in 2004. The defendants also focus upon the purpose of Rule 1.9, emphasizing that CAS did not accept representation of a new client and attack a former client.

While we have had few opportunities to examine conflicts of interest under Rule 1.9, *see Sullivan Cnty.*, 141 N.H. at 481, we note that the rule "codifies principles that have a long history of judicial acceptance," *id.*, and is based upon the 1983 version of the ABA Model Rules of Professional Conduct, *id.* at 480. Therefore, we look to decisions of other jurisdictions for guidance. When examining the trial court's decision in this case, we defer to its findings of fact if they are supported by the evidence and are not erroneous as a matter of law. *Franklin v. Callum*, 146 N.H. 779, 781 (2001). Because the trial court's interpretation of Rule 1.9 presents a question of law, we review its interpretation *de novo. See id.*

## III

The questions before us require that we consider both the soundness of the legal standard employed by the trial court in determining whether new T&M was a former client of CAS and further, whether the standard was properly applied. The trial court denied the plaintiffs' motion to disqualify CAS based solely upon the first prong of the Rule 1.9(a) test; namely, whether CAS and new T&M shared a valid attorney-client relationship. The trial court focused upon whether the attorney-client relationship CAS established with old T&M under Morgan's ownership was transferred to new T&M when Jeffrey and Peter acquired its stock.

Following *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343 (1985), and *Tekni-Plex*, 674 N.E.2d 663, the trial court applied the following legal standard:

> [W]hen ownership of a corporation changes hands, whether the [existing] attorney-client relationship transfers as well to the new owners turns on the practical consequences rather than the formalities of the particular transaction.
>
> . . . [W]here efforts are made to run the pre-existing business entity and manage its affairs, successor management stands in the shoes of prior management and controls the attorney-client privilege with respect to matters concerning the company's operations. Consequently, under such circumstances, the prior attorney-client relationship continues with the newly formed entity, whereas, the mere transfer of assets with no attempt to continue the pre-existing operation generally does not transfer the attorney-client relationship.

(Quotations and citations omitted.)

In applying this standard, the trial court principally focused upon the nature of the business conducted by T&M before and after the 2004 stock transfer to determine if it remained unchanged. It also considered whether new T&M, under the sons' ownership, retained any of old T&M's liabilities and obligations. Specifically, the trial court found that:

> [W]hen Morgan Goodrich operated T&M, the corporation primarily served to provide a broad range of engineering and surveying services. It also owned and managed a two-story office building in Lebanon, New Hampshire where it leased space to commercial tenants. Currently, T&M continues to operate as a New Hampshire corporation in good standing. However, it no longer provides engineering and surveying services. Rather, the corporation merely manages the two-story office building, receiving rent and paying bills as well as maintaining bank accounts. Indeed, other than managing the office building and maintaining bank accounts, there is no indication that the previous primary business operations of T&M continue under Peter and Jeffrey Goodrich's management. Nor is there any evidence that T&M possesses any of the liabilities and obligations that it did when operated by Morgan Goodrich.

Ultimately, the trial court ruled that "while T&M continues to exist as a corporate entity, the plaintiffs have failed to meet their burden of proving that T&M continues to exist as it did under Morgan Goodrich's management." Accordingly, it concluded that control of the attorney-client privilege did not pass with the stock transfer to the sons and, thus, new T&M was not

a former client of CAS. We conclude that the trial court used the proper legal standard but erroneously applied it.

■ In *Weintraub*, the United States Supreme Court considered whether a bankruptcy trustee of a debtor corporation could waive the attorney-client privilege of the debtor corporation with respect to pre-bankruptcy communications. *Weintraub*, 471 U.S. at 345. To decide the issue, the Court relied upon the succession of the attorney-client privilege when a change of corporate control occurs in the solvency context. *Id.* at 349, 351. Specifically, it noted with approval the following legal principle:

> [W]hen control of a corporation passes to' new management, the authority to assert and waive the corporation's attorney-client privilege passes as well. New managers installed as a result of a takeover, merger, loss of confidence by shareholders, or simply normal succession, may waive the attorney-client privilege with respect to communications made by former officers and directors. Displaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties.

*Id.* at 349. The court adapted this standard to the bankruptcy setting and determined that "[b]ecause the attorney-client privilege is controlled, outside of bankruptcy, by a corporation's management, the actor whose duties most closely resemble those of management should control the privilege in bankruptcy, unless such a result interferes with policies underlying the bankruptcy laws." *Id.* at 351-52. The Court determined that the bankruptcy trustee performed the control functions associated with the management of a solvent corporation and thus possessed the authority to exercise the attorney-client privilege regarding the pre-bankruptcy communications. *Id.* at 353; *see also Sobol v. E.P. Dutton, Inc.*, 112 F.R.D. 99, 103 (S.D.N.Y. 1986) (interpreting holding in *Weintraub*).

■ Courts nationwide have considered when the attorney-client privilege of one corporation passes to another in a wide variety of complex corporate transactions. *See, e.g., Tekni-Plex*, 674 N.E.2d 663; *Ramada*, 988 F. Supp. at 1460; *American Intern. Specialty Lines Ins. v. NWI-I*, 240 F.R.D. 401, 405 (N.D. Ill. 2007); *Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. 264 (D. Del. 1980); *In re I Successor Corp.*, 321 B.R. at 645, 652. Pivotal to the analysis is whether a particular corporate transaction allowed another entity to assume control of the corporation that had established the attorney-client privilege (hereinafter, the establishing corporation). *See, e.g., Ramada*, 988 F. Supp. at 1463; *American Intern.*, 240 F.R.D. at 407; *NCL Corp. v. Lone*

*Star Bldg. Centers (Eastern)*, 144 B.R. 170, 174 (S.D. Fla. 1992). To this end, courts usually examine whether the corporate transaction was a pure asset sale or effectuated a transfer of the establishing corporation's business operations, rights and liabilities. *See City of Rialto v. United States Dept. of Defense*, 492 F. Supp. 2d 1193, 1201 (C.D. Cal. 2007); *Ramada*, 988 F. Supp. at 1464; *Tekni-Plex*, 674 N.E.2d at 668.

■ A pure asset sale transfers only ownership over property, not control of the establishing corporation itself, and, accordingly, does not transfer the attorney-client privilege. *See, e.g., Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 836 F.2d 1332, 1336 (Fed. Cir. 1988); *Sobol*, 112 F.R.D. at 103; *SMI Industries Canada Ltd. v. Caelter Industries, Inc.*, 586 F. Supp. 808, 815-16 (N.D.N.Y. 1984); *R.G. Egan Equipment v. Polymag Tek*, 758 N.Y.S.2d 763, 770-71 (Sup. Ct. 2002). If, however, an entity acquires control of the establishing corporation's business operations, rights and liabilities, it is generally accepted that it also acquires authority over the attorney-client privilege. *See Bass Public Ltd. Co. v. Promus Companies, Inc.*, 868 F. Supp. 615, 620 (S.D.N.Y. 1994); *Medcom Holding Co. v. Baxter Travenol Laboratories*, 689 F. Supp. 841, 844 (N.D. Ill. 1988); *In re Sealed Case*, 120 F.R.D. 66, 70 (N.D. Ill. 1988); *Tekni-Plex*, 674 N.E.2d at 669. Transfer of the privilege allows the acquiring entity to pursue pre-existing rights or defend against pre-existing liabilities, *Tekni-Plex*, 674 N.E.2d at 669, in keeping with the corporation's best interests, *In re Sealed Case*, 120 F.R.D. at 70; *Medcom Holding Co.*, 689 F. Supp. at 844. Rejecting a mechanical or formulaic approach, however, courts review the "practical consequences" and substance of a given transaction by sifting the particular facts and circumstances involved before concluding whether the attorney-client privilege of the establishing corporation has been transferred. *See Ramada*, 988 F. Supp. at 1464; *American Intern.*, 240 F.R.D. at 407; *In re Sealed Case*, 120 F.R.D. at 70; *Soverain Software LLC v. GAP, Inc.*, 340 F. Supp. 2d 760, 763 (E.D. Tex. 2004).

■ We today adopt this "practical consequences" framework for analyzing what entity has dominion over the attorney-client privilege. Such framework furthers the legal principle identified in *Weintraub*, in that the corporate actor who gains control of an establishing corporation secures authority over its pre-existing attorney-client privilege. With respect to the matter at hand, the trial court used the "practical consequences" standard, and, accordingly, identified the proper test for determining whether CAS shared a valid attorney-client relationship with new T&M. Accordingly, we answer the first interlocutory appeal question in the negative.

## IV

The second question asks whether the trial court erred, as a matter of fact and law, in ruling that no valid attorney-client relationship exists between CAS and new T&M. The trial court based its conclusion upon its finding that new T&M's primary business is not sufficiently similar to that of old T&M. The parties ask us to decide whether the nature of the business conducted by new T&M following the stock transfer is a relevant factor in determining whether it acquired the attorney-client privilege that existed between CAS and old T&M. While this factor has some bearing on determining whether the attorney-client privilege transfers in a corporate transaction, we conclude that the trial court erred in how it relied upon this factor in this case.

The trial court principally relied upon *Tekni-Plex* to conclude that the continuity of T&M's business operations following the stock transfer was a pivotal factor in applying the "practical consequences" standard. We conclude that it interpreted *Tekni-Plex* too narrowly. *Tekni-Plex* involved a corporate acquisition in which one company, TP Acquisition Company, acquired another company, Tekni-Plex, Inc. For many years prior to the acquisition, the law firm of Meyner and Landis (M&L) had represented Tekni-Plex in various matters. *Tekni-Plex*, 674 N.E.2d at 665. It also represented the corporation's shareholder, Tom Tang, on several personal matters. *Id.* At some point, Tang and Tekni-Plex negotiated a merger agreement with TP Acquisition, and M&L represented both Tang and Tekni-Plex in the transaction. *Id.* Pursuant to the merger agreement, Tekni-Plex ceased its separate existence and conveyed all of its assets, rights and liabilities to TP Acquisition, which subsequently changed its name to Tekni-Plex, Inc. *Id.* All of the stock of old Tekni-Plex was cancelled. *Id.* New Tekni-Plex later sued Tang for misrepresentation and breach of warranty with respect to assurances made under the merger agreement. *Id.* Tang retained M&L to represent him, and new Tekni-Plex moved to disqualify the law firm, claiming former client status. *Id.* at 666.

In determining whether new Tekni-Plex acquired the attorney-client privilege that existed between old Tekni-Plex and M&L, the *Tekni-Plex* court followed *Weintraub* and utilized the "practical consequences" standard we adopt today. *Id.* at 668. It distinguished a corporation that purchases assets of another corporation, but makes no attempt to continue its pre-existing business operation, from a corporation that continues the business operations of the predecessor and manages its affairs. *Id.* Recognizing that old Tekni-Plex had ceased its legal existence, the court focused upon three facts: (1) whether "[TP] Acquisition was a mere shell corporation, created solely for the purpose of acquiring old Tekni-Plex"; (2) whether "[f]ollowing the merger, the business of old Tekni-Plex remained

unchanged, with the same products, clients, suppliers and non-managerial personnel"; and (3) whether "under the [m]erger [a]greement, new Tekni-Plex possessed all of the rights, privileges, liabilities and obligations of old Tekni-Plex, in addition to its assets." *Id.* at 669. It determined that "[a]s a practical matter, then, old Tekni-Plex did not die" and that "the business operations of old Tekni-Plex continued under the new managers." *Id.* Accordingly, the court held that the attorney-client privilege passed to the successor, and, thus, the successor was considered a former client of M&L. *Id.*

The trial court in the matter before us focused upon the court's finding in *Tekni-Plex* that the new company continued the business of the old company. At the heart of its analysis, however, the *Tekni-Plex* court considered whether the corporate affairs of the old Tekni-Plex ceased, such that new Tekni-Plex merely obtained the assets of the former entity rather than control over its pre-existing corporate affairs. Although the *Tekni-Plex* court noted that post-merger, the predecessor's business remained unchanged, it placed significant weight upon the fact that new Tekni-Plex "possessed all of the rights, privileges, liabilities and obligations of old Tekni-Plex, in addition to its assets." *Id.* As a result, the *Tekni-Plex* court concluded: "Certainly, new Tekni-Plex is entitled to access to any relevant pre-merger legal advice rendered to old Tekni-Plex that it might need to defend against these liabilities or pursue any of these rights." *Id.* It examined the circumstances and consequences of the merger, not in isolation, but as a whole for the purpose of determining whether new Tekni-Plex gained control of the business affairs of old Tekni-Plex. *See In re I Successor Corp.*, 321 B.R. at 653 (pertinent inquiry in *Tekni-Plex* was whether old corporation's business operations were to be continued under new management or whether the old corporation ceased to exist). Indeed, the court was following *Weintraub* and recognized that when control of a corporation passes to new ownership, the attorney-client privilege passes as well. *See Weintraub*, 471 U.S. at 348.

The trial court's conclusion here, that the plaintiffs "failed to meet their burden of proving that [new] T&M continue[d] to exist as it did under Morgan Goodrich's management," misses the mark. Whether old T&M continues to exist "as it did" under prior ownership is not the linchpin of the "practical consequences" standard. *See In re I Successor Corp.*, 321 B.R. at 652-53 (criticizing district court's decision that relied upon *Weintraub* for proposition that acquiring control of attorney-client privilege requires an effort to reconstitute or operate the pre-existing entity). Rather, the proper focus is upon whether control of old T&M passed with the transfer of ownership to Peter and Jeffrey. *See, e.g., Ramada*, 988 F. Supp. at 1463.

According to the trial court's factual findings, after the stock transfer to Peter and Jeffrey, T&M continued to operate as a New Hampshire corporation in good standing. Thus, the legal status of old T&M was not interrupted by the change in ownership. *Compare Tekni-Plex*, 674 N.E.2d at 669 (in merger transaction, because legal status of establishing corporation ceased to exist, court examined whether its pre-existing business was maintained by, and rights and liabilities transferred to, the purchasing corporation), *with Medcom Holding Co.*, 689 F. Supp. at 844 (in sale of stock transaction, establishing corporation's identity was preserved, ability of successor management to exercise normal management prerogatives was assumed, and, thus, new owner had control over attorney-client privilege regarding pre-stock sale communications). Further, while new T&M no longer provided engineering and surveying services, it continued to own, manage and lease the corporate office building that was part of its business under Morgan's ownership. Therefore, when Morgan transferred his stock in old T&M to Peter and Jeffrey, control of the corporation transferred, and, therefore, the attorney-client privilege was also transferred to new T&M. *See Medcom Holding Co.*, 689 F. Supp. at 844 (parties who negotiate a corporate acquisition should expect that the privileges of the acquired corporation would be incidents of the sale, subject to the terms of any special agreements); *In re Sealed Case*, 120 F.R.D. at 71 (same).

We note that the trial court found that the plaintiffs failed to submit evidence "that [new] T&M possesse[d] any of the liabilities and obligations that it did when operated by Morgan Goodrich." The trial court erred, however, by placing this burden of production upon the plaintiffs. The record reflects that after the parties filed pleadings addressing the disqualification issue, the trial court issued an interim order directing the plaintiffs to provide the following:

> Certified copies of the records of the New Hampshire Secretary of State's Office for the corporate entity, T&M Associates, Inc.; and

> An affidavit of Peter Goodrich and Jeffrey Goodrich setting forth the present status of T&M Associates, Inc.

The plaintiffs submitted a certificate of incorporation from the Secretary of State, as well as corporate articles of agreement, minutes of the organizational meeting, and articles of amendment. They also submitted affidavits of Peter and Jeffrey, in which they averred that the corporation was in good standing, leased an office building to commercial tenants, and currently did not perform engineering or surveying work. The record provides no indication that the defendants challenged the plaintiffs' factual represen-

tations. Once the plaintiffs established that T&M maintained its corporate existence, a presumption arose that it likewise retained all of its pre-existing rights and liabilities. *See In re Sealed Case,* 120 F.R.D. at 70 (sale of stock that contemplates continuance of corporate existence "with the normal attributes of a business corporation" includes transfer of rights, assets, liabilities and obligations which "go back to the time of its incorporation"). At that point, the defendants bore the burden of producing evidence to rebut the presumption or otherwise demonstrate that the stock transfer did not effectuate a transfer of control to new T&M.

Furthermore, when the plaintiffs filed their motion for reconsideration of the trial court's denial of their motion to disqualify CAS, they attached an affidavit authored by Jeffrey that identified numerous pre-existing corporate rights, privileges, liabilities and obligations of old T&M currently possessed by new T&M. These included: (1) all the project files originated after Jeffrey and Peter were fired from the company; (2) corporate debt owed to the Internal Revenue Service; (3) debt involving the leased office building; and (4) potential claims arising out of the misconduct of the business by former management. In their objection, the defendants offered no challenge to the plaintiffs' claim that new T&M continued to possess pre-existing rights and liabilities, and instead remained fixed upon the lack of continuity in the nature of new T&M's primary business. Indeed, even in their appellate brief, the defendants offer no dispute to these factual averments.

In its denial of the plaintiffs' motion to reconsider, the trial court ruled that:

> The plaintiff[s'] Motion to Reconsider ... contains no issues of fact or law which were not previously considered by the Court or which warrant a different result than that determined by the Court in its Order . . . .

The ruling indicates that the trial court deemed it legally irrelevant whether new T&M acquired rights and liabilities previously belonging to old T&M. This was error. Authority over the establishing corporation's pre-existing attorney-client privilege is concomitant with the transfer of control of such corporation, which can be evidenced by the new owners acquiring the establishing corporation's rights and liabilities. *See, e.g., Weintraub,* 471 U.S. at 349; *Bass Public Ltd. Co.,* 868 F. Supp. at 620; *In re Sealed Case,* 120 F.R.D. at 70; *Medcom Holding Co.,* 689 F. Supp. at 844; *Tekni-Plex,* 674 N.E.2d at 669. Therefore, under the circumstances of this case, the trial court should have granted the motion to reconsider, *see Broom v. Continental Cas. Co.,* 152 N.H. 749, 752 (2005), determined that T&M under its new ownership had a valid attorney-client relationship with

CAS, and considered the remaining factors of the Rule 1.9(a) test for disqualification. Accordingly, we vacate both the trial court's denial of the motion for reconsideration and its order ruling that T&M under its new ownership had no valid attorney-client relationship with CAS.

## V

■ Before concluding, we address some remaining points. The defendants argue that Rule 1.9 is not implicated in this case because CAS never changed sides in the controversy by engaging the representation of a new client to attack a former client. They emphasize that "the true parties and their alignment have never changed. Plaintiffs have always been against Morgan, Crystal, and Mr. Clauson. Wiggin & Nourie [has] always represented Plaintiffs. CAS has always represented Morgan, Crystal, and Mr. Clauson in defense of Plaintiffs' claims."

The defendants rely upon the ABA Model Rule 1.9 comment which states: "The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question." This specific comment, however, falls within an explanation of the scope of the term "matter" used in Rule 1.9, and does not purport to address the former client requirement. *See* N.H. R. PROF. CONDUCT 1.9(a) 2004 ABA Model Code Comment [2]. Additionally, we are not persuaded by the defendants' bold argument that "[e]very decided Rule 1.9 conflict of interest case found involves an attorney accepting a new client whose position may be adverse to a former client." Our own research reveals cases in which a law firm engaged in joint representation of a corporation and individual directors or officers, but later solely represented the individual directors and officers against the corporation. Courts have discussed whether the law firm had changed sides in the controversy when examining whether the two cases involving the law firm's representation were "substantially related," with particular emphasis upon whether the former client could have reasonably expected confidences to be withheld from the other clients that had been previously involved in joint representation. *See, e.g., Christensen v. United States D. Court for Cent. D. of Cal.*, 844 F.2d 694, 698-99 (9th Cir. 1988); *Allegaert v. Perot*, 565 F.2d 246, 250-51 (2d Cir. 1977); *In re I Successor Corp.*, 321 B.R. at 655-57; *Bagdan v. Beck*, 140 F.R.D. 660, 664-68 (D.N.J. 1991); *Kempner v. Oppenheimer & Co., Inc.*, 662 F. Supp. 1271, 1277-78 (S.D.N.Y. 1987); *Neiman v. Local 144, Hotel, Hospital, Etc.*, 512 F. Supp. 187, 189-90 (E.D.N.Y. 1981). Rule 1.9 also contains a "substantially related" prong, and it is distinct from the "former client" criterion. *See Sullivan Cnty.*, 141

N.H. at 482-83. Therefore, we conclude that the defendants' argument is not relevant in the context of the former client question at issue in this interlocutory appeal.

Finally, we note that both parties made arguments beyond the scope of the questions transferred, and we decline to address them here. *See Everitt v. Gen. Elec. Co.*, 156 N.H. 202, 207-08 (2007).

## VI

In summary, we hold that the trial court's decision to utilize the "practical consequences" legal standard to assess whether T&M under its new ownership constituted a "former client" of CAS was correct. The trial court erred, however, in its application of that standard by relying almost exclusively upon its finding that new T&M's primary business today is not sufficiently similar to its business conducted under prior ownership. We vacate the trial court's ruling that new T&M is not a former client of CAS, as well as its denial of the plaintiffs' motion to reconsider. We remand for further proceedings consistent with this opinion.

*Vacated and remanded.*

DALIANIS, DUGGAN and GALWAY, JJ., concurred.